UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
WILLIAM F. HASPER,

|  |  |
|---|---|
| *Plaintiff*, | **Docket No.:** 20-cv-2349 |

- against -

COUNTY OF NASSAU, DETECTIVE/SERGEANT     **COMPLAINT**
WILLIAM S. RUSSELL, DETECTIVE RYAN M.
LUNT, DETECTIVE VINCENZO VACCHIANO,
DETECTIVE THOMAS A. ROCHE, DETECTIVE
BARRY PURCELL, DETECTIVE JONATHAN
PANUTHOS, DETECTIVE/SERGEANT NABIL
HUSSAIN, LIEUTENANT VALERIE F. TROISE,     **JURY TRIAL**
and JOHN DOES NO. 1 AND NO. 2,     **DEMANDED**

*Defendants*.
---------------------------------------------------------------------- X

     Plaintiff, WILLIAM F. HASPER, by and through his attorneys The Law Office of
Anthony M. Grandinette, alleges the following:


**INTRODUCTORY STATEMENT**


   1.   Plaintiff, William F. Hasper, commenced this action due to the various defendants
violating his rights and privileges guaranteed to him by the United States Constitution, as well as
by the Constitution and laws of the State of New York, starting on February 15, 2019, and
continued thereafter. Among other constitutional infringements, Defendants falsely arrested
Hasper on February 17, 2019, subsequently caused him to be unlawfully stopped twice, once at
gunpoint, and maliciously prosecuted him based upon charges they knew were fabricated, all in
order to cover up the improper conduct of Defendant Nassau County D/Sgt. William Russell.


**JURISDICTION AND VENUE**


   2.   This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, and
Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the
State of New York.


   3.   Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.


   4.   Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate pendant
New York State law claims pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).


## **PARTIES**

6.     Plaintiff, WILLIAM F. HASPER ("Hasper"), is a resident of the County of Nassau, State of New York.

7.     Defendant COUNTY OF NASSAU ("Nassau County") is a county within the State of New York. At all times relevant herein, Nassau County was the public entity under which the Nassau County Police Department ("NCPD), its political subdivision, was organized, and was the public employer of the individually-named and John Doe defendants in this action, who at all times relevant herein were employed by the NCPD and acted under color of state law and within the scope of their employment.

8.     Defendant DETECTIVE/SERGEANT WILLIAM S. RUSSELL, D/Sgt. Shield No. 133, current Sgt. Shield No. 596, ID No. 8785 ("D/Sgt. Russell"), is a resident of Nassau County, State of New York. At all relevant times herein, D/Sgt. Russell was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. D/Sgt. Russell is being sued in his individual and official capacities.

9.     Defendant DETECTIVE RYAN M. LUNT, Shield No. 1313, ID No. 8894 ("Det. Lunt"), is a resident of Nassau County, State of New York. At all relevant times herein, Det. Lunt was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. Det. Lunt is being sued in his individual and official capacities.

10.     Defendant DETECTIVE VINCENZO VACCHIANO, Shield No. 960, ID No. 8310 ("Det. Vacchiano"), is a resident of Suffolk County, State of New York. At all relevant times herein, Det. Vacchiano was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. Det. Vacchiano is being sued in his individual and official capacities.

11.     Defendant DETECTIVE THOMAS A. ROCHE, ID No. 8705 ("Det. Roche"), is believed to be a resident of Nassau County, State of New York. At all relevant times herein, Det. Roche was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. Det. Roche is being sued in his individual and official capacities.

12.     Defendant DETECTIVE BARRY PURCELL, Shield No. 906, ID No. 6920 ("Det. Purcell"), is a resident of Nassau County, State of New York. At all relevant times herein, Det. Purcell was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his

employment and/or in his individual capacity. Det. Purcell is being sued in his individual and official capacities.

13. Defendant DETECTIVE JONATHAN PANUTHOS, ID No. 8486 (Det. Panuthos"), is believed to be a resident of Suffolk County, State of New York. At all relevant times herein, Det. Panuthos was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. Det. Panuthos is being sued in his individual and official capacities.

14. Defendant DETECTIVE/SERGEANT NABIL ('Bill') HUSSAIN, Shield No. 200, ID No. 864 ("D/Sgt. Hussain"), is believed to be a resident of Queens or Nassau County, State of New York. At all relevant times herein, D/Sgt. Hussain was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of his employment and/or in his individual capacity. D/Sgt. Hussain is being sued in his individual and official capacities.

15. Defendant LIEUTENANT VALERIE F. TROISE, Shield No. 459, ID No. 8190 ("Lt. Troise"), is a resident of Suffolk County, State of New York. At all relevant times herein, Lt. Troise was an employee of the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein acted under color of state law, and within the scope of her employment and/or in her individual capacity. Lt. Troise is being sued in her individual and official capacities.

16. Defendant JOHN DOE NO. 1 ("John Doe. No. 1") was, at all relevant times herein, a male detective employed by the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein, acted under color of state law, and within the scope of his employment and/or in his individual capacity. Plaintiff does not yet know John Doe No. 1's identity, however Defendants do know his identity. John Doe No. 1 unlawfully entered Plaintiff's home on February 15, 2019 along with Det. Roche, and unlawfully remained therein. He may be, but is not necessarily, one of the other individually-named detective defendants— Det. Lunt, Det. Vacchiano, Det. Purcell, or Det. Panuthos. John Do. No. 1 is being sued in his individual and official capacities. Plaintiff is placing Defendants on notice that after he learns John Doe No. 1's identity, unless John Doe No. 1 is already individually-named as a defendant in this action, Plaintiff will seek leave to amend his Complaint to name John Doe No. 1 accordingly.

17. Defendant JOHN DOE NO. 2 ("John Doe. No. 2") was, at all relevant times herein, a male Police Officer employed by the NCPD, a political subdivision of Defendant Nassau County, and at all relevant times herein, acted under color of state law, and within the scope of his employment and/or in his individual capacity. Plaintiff does not yet know John Doe No. 2's identity, however Defendants do know his identity. John Doe No. 2 unlawfully entered Plaintiff's home on February 15, 2019 along with Det. Roche and John Doe No. 1, and unlawfully remained therein. John Do. No. 2 is being sued in his individual and official capacities. Plaintiff is placing Defendants on notice that after he learns John Doe No. 2's identity, he will seek leave to amend his Complaint to name John Doe No. 2 accordingly.

18.   Plaintiff is placing Defendants on notice that should he learn during the course of discovery of additional conduct committed by Defendants which may give rise to liability, or of the identities of additional individuals, particularly employees of the NCPD, who committed acts which may give rise to liability, that he will seek to amend his Complaint to allege additional claims and/or to name additional defendants, accordingly.

## NEW YORK NOTICE OF CLAIM REQUIREMENTS

19.   On May 14, 2019, after some of the events giving rise to allegations in this Complaint and prior to commencing this action, Plaintiff served a timely Notice of Claim on Nassau County (which also named certain defendants individually named herein) in compliance with New York General Municipal Law § 50-e. *See* Exhibit A.

20.   On February 19, 2020, following Plaintiff's criminal trial and his acquittal of certain charges therein and prior to commencing this action, Plaintiff served a second Notice of Claim on Nassau County (which likewise named certain defendants individually named herein) in compliance with GML § 50-e. *See* Exhibit B.

21.   At least thirty days have elapsed since the service of each Notice of Claim, and Nassau County has neglected or refused to adjust or pay the claims.

22.   Plaintiff was examined pursuant to GML § 50-h on May 1, 2020, prior to commencing this action.

23.   As to the pendant state law claims, this action was commenced within one year and ninety days after the incidents upon which these claims arose.

## FACTUAL AND GENERAL ALLEGATIONS

### PLAINTIFF'S EDUCATIONAL AND EMPLOYMENT BACKGROUND

24.   Hasper comes from a long line of police officers. His grandfather, also named William F. Hasper, joined the New York City Police Department ("NYPD") in 1943, and served as a distinguished member for 34 years. Hasper's father, also named William F. Hasper, joined the NYPD in 1963 after serving in the United States Air Force for four years, and served as a distinguished member of the NYPD for 36.5 years until he retired in 1999. Hasper's brother, James E. Hasper, started his career in the NYPD in 1999, and he is currently in his 21st year of service, serving in the NYPD's 42nd Precinct. Hasper also had two uncles who proudly served an additional combined 63 years of service between the NYPD, the New York City Fire Department, and the City of Newark Police Department in New Jersey.

25.   At the age of 17, after graduating from Deer Park High School in 1984, Hasper attended the United States Military Academy at West Point. Hasper graduated from West Point on May 25, 1988 with degrees in Engineering and Management. Between August and December 1988,

Hasper attended the United States Army Air Defense Artillery School at Fort Bliss in El Paso, Texas, where he graduated as his class valedictorian. Between January and April 1989, Hasper attended and graduated from the United States Army Ranger School at Fort Benning in Columbus, Georgia. Hasper began his first assignment in May 1989, as a Second Lieutenant, Platoon Leader, in Giessen, Germany, assigned to a Patriot Missile Battery.

26.     During his five years of military education and training, Hasper learned the significance of obeying the orders of his superior officers and acting in a respectful manner to all of his colleagues.

27.     Hasper went on to serve his country as an officer and elite Airborne Ranger for the United States Army. From December 1990 until June 1991, Hasper was deployed and proudly served in combat operations during the First Gulf War, as part of Operations Desert Shield and Desert Storm. Hasper was a Tactical Control Officer in charge of a Patriot Missile Battery, and was actively engaged in launching Patriot Missiles at incoming Scud Missiles in defense of the city of Tel Aviv, Israel. Hasper was honorably discharged from the United States Army, active duty, in 1991.

28.     During his four-year tenure as an officer and Airborne Ranger, including during active wartime service, Hasper displayed the discipline of respecting and obeying the orders of his superior officers, even under the most difficult of circumstances.

29.     After his honorable discharge from the United States Army, Hasper continued on as a Captain in the United States Army Reserves while maintaining employment with Merrill Lynch, until his discharge on December 31, 1996. However, after being honorably discharged and no longer on active duty status, Hasper wanted to serve his community as a police officer, as his father and grandfather did before him.

30.     On December 6, 1993, Hasper was appointed to, and began his career with, the Suffolk County Police Department ("SCPD").

31.     Between January 1997 and July 2000, Hasper served as a Police Officer in the Highway Patrol Bureau ("HPB"). Hasper was engaged in the specific duty of enforcing the Vehicle and Traffic Laws of the State of New York. During his tenure in the HPB, Hasper conducted thousands of vehicle traffic stops pursuant to his training, and the rules and procedures of the SCPD. While assigned to the HPB, Hasper was assigned as a Field Training Officer, and was responsible for training other Police Officers in the application of the SCPD rules and procedures related to vehicle traffic stops. As a result, on February 15, 2019, the date the events giving rise to this lawsuit began, Hasper had a keen understanding of the New York State Vehicle and Traffic Laws, and the rules and procedures pertaining to traffic stops and the issuance of traffic summons, and he was intimately familiar with the actions a law enforcement officer would take during a vehicle and traffic stop.

32.     In July 2000 Hasper was promoted to Sergeant. From July 2000 until August 2004, he served as a Patrol Sergeant for the SCPD First Precinct, Suffolk County's most active precinct. As a Patrol Sergeant, Hasper was responsible for supervising and training up to 20 Police

Officers during each tour of duty, and throughout his tenure as a Sergeant, Hasper instructed on, and reinforced, the policies, rules, and procedures of the SCPD to Police Officers under his command. Accordingly, he was required to be intimately familiar with the policies, rules, and procedures of the SCPD, to ensure that all those under his command followed them. These policies, rules, and procedures included, but were not limited to, vehicle and traffic stops, proper communication during traffic stops, safety protocols, accident reports, criminal investigations, and engaging in professional behavior in all police activities (CPR—Courtesy, Professionalism, Respect).

33.     From August 2004 through February 2005, Hasper was assigned to the SCPD Second Precinct Crime Section Unit as the Supervising Sergeant. The Crime Section Unit consisted of five members who were responsible for investigating and prosecuting misdemeanor crimes and violations. In that capacity, Hasper directly supervised and trained four Police Officers—"Junior Detectives"—in investigations and arrests of perpetrators for misdemeanor crimes and violations, committed within the confines of the Second Precinct.

34.     In February 2005, Hasper was promoted to Lieutenant. From February 2005 until July 2007, he served as a Patrol Lieutenant for the Second Precinct. In that capacity, Hasper worked the overnight tour, and as a result, was the Office of the Second Precinct during each tour of duty. Hasper supervised a squad of up to 40 uniformed Patrol Officers, and five Sergeants. As a Patrol Lieutenant, he was also responsible for the overall operations and supervision of the Second Precinct and those members assigned thereto, on a daily basis. As with his duties and responsibilities as a Sergeant, as a Lieutenant, Hasper instructed on, and reinforced, the policies, rules, and procedures of the SCPD to those under his command, and accordingly, he was required to be intimately familiar with the policies, rules, and procedures of the SCPD to ensure that those under his command followed them.

35.     In July 2007, Hasper was appointed Commanding Officer of the SCPD Court Liaison Section. In that capacity, he supervised a 14-member unit which dealt with processing prisoners, the administration and coordination of arrest paperwork, and communications and appearances of police personnel within the Suffolk County Court system which included the County, District, Family, and Supreme Courts.

36.     On April 9, 2012, after serving for 19 years and five months, Hasper retired as a Lieutenant from the SCPD due to a permanent disability. He had previously been involved in an on-duty fatal motor-vehicle accident, during which he suffered physical injuries to his head, neck, and back, which had progressively worsened over time.

37.     On February 15, 2019, the date the events giving rise to this lawsuit began, Hasper had great respect for all police personnel, given that in total, commencing in 1943 and continuing to this day, Hasper, along with his grandfather, father, brother, and two uncles, served a combined 173 years as police officers within the State of New York and New Jersey. In short, police service was, and is, an ingrained family tradition in the Hasper household.

38.     For 28 consecutive years, starting at the age of 17 when he joined the United States Military Academy at West Point in 1984 and through his retirement from the SCPD in 2012,

Hasper worked within a strict chain of command. As a result, the personality trait of respecting police and military authority is so ingrained in him, that he continues to do so to the present day. Based upon his military and police background, Hasper will automatically respond to all police personnel in the field in a positive and professional manner, e.g., responding "Yes sir."

### HASPER'S ENCOUNTER WITH D/SGT. RUSSELL

39.    D/Sgt. Russell and other defendants made several false and outrageous claims against Hasper in order to justify Hasper's false arrest, which are completely contrary to Hasper's nature and training. Specifically, they falsely claimed that following a minor traffic incident in a bank parking lot, Hasper, being completely unprovoked, started screaming at D/Sgt. Russell, calling him a "fuckin asshole and a cock sucker." D/Sgt. Russell claimed that thereafter, Hasper disobeyed a lawful order, and intentionally struck D/Sgt. Russell six times with his pickup truck injuring D/Sgt. Russell, prior to Hasper fleeing the scene.

40.    The following events described in paragraphs 41 through 98 lasted approximately eight minutes and 28 seconds, and were recorded on surveillance videos from a 7/11, *see* Exhibit C, and the Laundry Stadium. *See* Exhibit D. Unfortunately, neither video captured audio.

41.    On February 15, 2019, D/Sgt. Russell was assigned to the NCPD Internal Affairs Unit. At approximately 12:25 PM, D/Sgt. Russell was on-duty, however he was dressed in plainclothes and was driving an unmarked four-door sedan police car, and there was nothing to identify him as a member of law enforcement, or his vehicle as belonging to law enforcement.

42.    D/Sgt. Russell was driving down Old Country Road in Westbury, New York, which, at that location, is a four-lane roadway—two lanes eastbound and two lanes westbound—with a common turn lane in between. D/Sgt. Russell was traveling westbound on Old Country Road and made a left-hand turn, without using his directional signal, to enter the Bethpage Federal Credit Union located at 750 Old County Road, Westbury, New York ("BFCU").

43.    Despite being on-duty at the time, D/Sgt. Russell went to the bank for personal matters—to deposit $950 cash into his personal checking account, and to withdraw $3,000 from his business account.

44.    Hasper was driving his pickup truck, and likewise made the left turn from the turning lane in order to enter the bank's parking lot.

45.    However, D/Sgt. Russell never fully entered the parking lot. Rather, he stopped his vehicle on the apron of the parking lot entrance, as he waited for a parking spot to open up. As a result, the front-end of his vehicle was obstructing the entrance to the bank's parking lot, the middle of his vehicle was obstructing the sidewalk, and the rear bumper of his vehicle was slightly obstructing a portion of the right-hand eastbound-travel lane of Old Country Road.

46.    D/Sgt. Russell remained in that position for approximately one minute. There were no physical obstructions or traffic impediments that prevented him from driving his vehicle into the

parking lot, and it was obvious that he elected to impede traffic until a spot became available to him.

47.     D/Sgt. Russell frequently visited the Westbury branch of the BFCU at least over the course of the prior year and a half, and indeed leaves in that vicinity. Therefore, he was aware of traffic patterns in the area, and knew that the bank parking lot was often full and busy, especially over the lunch hour.

48.     Conversely, Hasper was a new member of the BFCU, and as of February 15, 2019, had only been to the Westbury location on one prior occasion, when he opened an account four days prior.

49.     When Hasper made the left-hand turn in order to enter the bank's parking lot, he anticipated that the car in front of him would proceed forward into the parking lot, which would have allowed him to likewise enter the parking lot. Given his elevated seating in the pickup truck, Hasper did not observe anything that would have prevented the car in front of him from proceeding forward. When Hasper made the left-hand turn, he did so in a reasonable and prudent fashion, as Old Country Road was clear of oncoming traffic at that time.

50.     Unfortunately, D/Sgt. Russell remained stationary on the apron of the parking lot, thereby continuing to block its entrance. This caused Hasper's truck to block the eastbound travel lanes on Old Country Road. Not wanting to obstruct traffic or to cause an accident, Hasper lightly taped his horn twice, alerting D/Sgt. Russell of his situation, and requesting that D/Sgt. Russell pull forward. However, this angered D/Sgt. Russell. Rather than pulling forward to allow Hasper to enter the parking area, D/Sgt. Russell intentionally remained stationary, leaving Hasper's vehicle exposed to oncoming traffic.

51.     After waiting approximately five seconds, when another vehicle travelling eastbound on Old Country Road was approaching Hasper's truck and started honking at Hasper given the obstruction, Hasper once again taped his horn twice, alerting D/Sgt. Russell of his situation, anticipating that D/Sgt. Russell would do the safe and courteous thing and pull forward. Once again, however, rather than pulling forward to allow Hasper to enter the parking lot and move out of the roadway, D/Sgt. Russell intentionally remained stationary, continuing to leave Hasper's vehicle exposed to oncoming traffic. At the same time, D/Sgt. Russell looked at Hasper through his side view mirror and smirked at him, making it clear to Hasper that he was deliberately refusing to pull forward.

52.     After approximately another five seconds, a second vehicle travelling eastbound on Old Country Road approached, and was likewise forced to stop because D/Sgt. Russell caused Hasper's truck to obstruct the roadway. The drivers of both vehicles which were forced to stop were honking their horns at Hasper, therefore at this time, Hasper honked his horn more deliberately for several seconds, ensuring that D/Sgt. Russell was aware of the urgency of the situation he was creating.

53.    Each time Hasper tapped, and then later honked, his horn, he did so simply in a manner to alert D/Sgt. Russell of a potentially dangerous traffic situation, and for no other reason. Hasper utilized his horn for its intended purpose, and his doing so was both necessary and lawful.

54.    Finally, and only after a parking spot opened up in the bank's parking lot, D/Sgt. Russell started pulling forward, which allowed Hasper to enter the parking lot as well. That, in turn, allowed the two vehicles which were stopped on Old Country Road, to continue driving eastbound.

55.    Given that only one parking spot had become available, Hasper backed his truck into the empty handicapped spot, where he remained briefly with his truck running, until such time as a spot opened up. He did so in order to avoid obstructing Old Country Road as D/Sgt. Russell had done, and as a courtesy to other motorists on the road. Hasper stood idol with his truck motor running, and at no time did he "park" his vehicle, as defined in the New York State Vehicle and Traffic law, in the BFCU handicapped parking spot.

56.    At this point, the matter with D/Sgt. Russell should have concluded, had D/Sgt. Russell simply walked inside the BFCU to perform his personal banking.

57.    Instead, D/Sgt. Russell walked in the opposite direction of the bank's entrance, over to Hasper's driver's side window while Hasper was still straightening his truck in the parking spot, and yelled, "Hey asshole, do we have a problem here?!" D/Sgt. Russell was visibly enraged that Hasper had honked his horn at him and requested that he pull forward into the parking lot, before a parking spot had become available.

58.    While Hasper was moving in reverse straightening his truck, he was paying attention to his backup camera and immediate vicinity to ensure he did not strike a pedestrian or another vehicle, both of his hands were occupied with the wheel and the shift column, and therefore, he was not paying any attention to D/Sgt. Russell prior to D/Sgt. Russell appearing at his driver's side window.

59.    Because D/Sgt. Russell was not in uniform, did not display a shield, and he had not been driving a marked police vehicle, there was no way Hasper could have known that D/Sgt. Russell was a police officer.

60.    Hasper calmly responded to D/Sgt. Russell, stating, in sum and substance, 'Why didn't you pull up? You saw I was blocking traffic and people were honking at me.'

61.    Still enraged, D/Sgt. Russell angrily shouted, "Hey guy, the way it works around here is you fucking wait, you fucking wait, and when it's clear then you fucking pull in. Got it?!"

62.    Visibly enraged, D/Sgt. Russell continued screaming and spitting at Hasper. In response to D/Sgt. Russell's extreme behavior, Hasper told him, "Real nice, asshole," to which D/Sgt. Russell responded, "I'll show you who the fucking asshole is! You'll see who the asshole is!"

63.     This entire verbal exchange lasted approximately 15 seconds. Thereafter, D/Sgt. Russell walked to the rear of Hasper's truck, where he remained, pacing at times, for approximately 33 seconds, until another parking spot opened up and Hasper parked his truck in it.

64.     D/Sgt. Russell's behavior was outrageous, unprofessional, and disturbing.

65.     Unlike D/Sgt. Russell, Hasper attempted to deescalate the situation. After getting out of his truck, he walked away from D/Sgt. Russell and walked toward the bank. As he did so, he observed D/Sgt. Russell standing on the sidewalk near the handicapped spot, speaking on his cell phone.

66.     Seeing him walk away, D/Sgt. Russell shouted after Hasper, "Hey tough guy, don't think you're just walking away from this. You'll see who the fucking asshole is." Hasper responded, "Fuck off pal," and then added, "Have a nice day asshole," as he continued toward the bank and entered.

67.     Upon entering the bank, Hasper approached the bank's security guard, Cameron Grady ("Grady"), and apologized for the commotion, explaining that he had merely honked his horn at the car in front of him because it was blocking the entrance to the parking lot.

68.     Hasper then got in line to speak with a teller, and filled out a deposit slip. While he waited, D/Sgt. Russell repeatedly circled Hasper's truck, while speaking on his cell phone.

69.     While waiting in line at the bank, Hasper looked out through a window toward the parking lot, and noticed D/Sgt. Russell staring him down, with arms crossed.

70.     Hasper believed that D/Sgt. Russell may have been calling friends when he observed him on the phone, and was perhaps looking to engage him in a physical altercation. Wanting to avoid any further confrontation with D/Sgt. Russell, verbal or physical, and to deescalate the situation, Hasper decided to leave the bank.

71.     Disturbed by D/Sgt. Russell's irrational behavior and threatening comments, on his way out Hasper told Grady that the guy outside was acting irrational and Hasper didn't know who that guy was calling, that he, Hasper, had a bad back and he did not want any problems, and would Grady please "watch my back" as he went to his car. Hasper told Grady that he would return to do his banking later on.

72.     Upon exiting BFCU, Hasper walked directly to his truck. D/Sgt. Russell approached him, and despite being completely unprovoked, immediately started making threatening and unprofessional comments to Hasper, such as, "Hey tough guy, what the fuck do you think you're doing?! Where the fuck do you think you're going?!" These comments reaffirmed Hasper's belief that D/Sgt. Russell was looking for trouble, and Hasper wanted no part of it.

73.     Despite D/Sgt. Russell's statements, Hasper ignored him and continued walking directly to his truck, wanting to leave the area to avoid any potential physical confrontation.

74.    However, after Hasper entered his truck to back out of the parking spot and drive away, D/Sgt. Russell stood behind the truck to attempt to prevent him from leaving the parking lot.

75.    While watching D/Sgt. Russell in his backup camera, and utilizing his truck's rear sensor device, Hasper inched backwards slowly, careful to avoid coming into contact with D/Sgt. Russell. Hasper's truck never came into contact with D/Sgt. Russell.

76.    When he could no longer back up without touching D/Sgt. Russell, Hasper placed his truck in park, exited his vehicle, walked to the rear of his truck, and said to D/Sgt. Russell, "Hey, you have no right to block my egress from this parking lot, I am just trying to get out of here!" Hasper then reentered his truck and continued inching backward carefully, ensuring that he did not come into contact with D/Sgt. Russell, or any vehicle that was near him. At that point, D/Sgt. Russell slowly moved to the passenger side of the truck, and Hasper was able to angle out backwards out of the head-in parking spot.

77.    Hasper then continued turning his wheel to the left to continue straightening his truck, so that he could drive forward and out of the parking lot, and then slowly started driving forward. At the same time, D/Sgt. Russell moved toward the front of Hasper's truck. Wanting to leave the area to avoid a physical confrontation, Hasper slowly continued inching forward to leave the parking lot. At that time, he noticed Grady rushing forward on his left, so he rolled down his window to seek Grady's assistance.

78.    Grady had observed the encounter though the bank's glass door, and had come outside to try to ensure that the situation did not escalate while he was on duty.

79.    Given D/Sgt. Russell's refusal to move out of the way, Hasper inched forward very slowly and carefully to insure no one was injured and to leave the scene. At the same time, Grady, who at this time was standing near the driver's side front bumper of Hasper's truck, was yelling at D/Sgt. Russell to "get out of his way! What are you doing?! You can't do that, let him go!"

80.    Despite D/Sgt. Russell's later claims to the contrary, he never had his shield out. Rather, as Hasper observed and Grady confirmed, D/Sgt. Russell was holding the cell phone which Hasper had observed him speaking on earlier.

81.    Hasper carefully drove out of the BFCU parking lot to proceed eastbound on Old Country Road. He paused before entering Old Country Road to ensure it was safe to do so. Both eastbound lanes were clearly visible to him, and he observed that they were both free and clear of oncoming traffic.

82.    D/Sgt. Russell moved away from the front of Hasper's truck, and Hasper then turned into the right-hand lane on Old Country Road and proceeded eastbound. In Hasper's mind, he had just avoided a very volatile road rage incident which may have turned physical. Having been a police officer for approximately 20 years, Hasper was unfortunately all too familiar with road rage incidents that turn ugly, and being levelheaded, he wanted nothing to do with it.

83.     Contrary to D/Sgt. Russell's subsequent claims that he repeatedly identified himself as an officer to Hasper, displayed his shield several times, and told Hasper he was not free to leave and that a patrol car was on its way to conduct an investigation, D/Sgt. Russell had never done or said any of these things.

84.     In fact, throughout the entire incident, D/Sgt. Russell never said or did anything which would have indicated to Hasper that D/Sgt. Russell was a member of law enforcement. Throughout this entire encounter, D/Sgt. Russell acted in a manner that was clearly contrary to the rules and procedures which police officers are trained in pertaining to vehicle stops and pursuits, which, if he *had* acted in accordance with those rules and procedures, may have alerted Hasper to the fact that D/Sgt. Russell was a member of law enforcement.

85.     At no time during this entire incident did D/Sgt. Russell identify himself as a sergeant, or any other member of law enforcement, display his shield or identification card, ask for Hasper's license, registration, and/or insurance card, activate the lights or siren in his unmarked vehicle, use a radio, or say or do anything else which someone behaving as police officer would do. Rather, D/Sgt. Russell's behavior was anti-social, his language sophomoric and threatening, and his conduct dangerous and aggressive. In short, there was no reason for Hasper, or Grady, a security officer, to believe that D/Sgt. Russell was a member of law enforcement during this brief encounter in the parking lot.

86.     Accordingly, at no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper believe, or have reason to believe, that D/Sgt. Russell was a police officer.

87.     At no time prior to Hasper exiting, and while he exited, the BFCU parking lot, did D/Sgt. Russell give him any lawful order.

88.     At no time prior to Hasper exiting, and while he exited, the BFCU parking lot, was D/Sgt. Russell performing or attempting to perform a lawful duty.

89.     At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper intend to prevent D/Sgt. Russell from performing a lawful duty.

90.     At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper intend to cause physical injury to D/Sgt. Russell.

91.     At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper cause physical injury to D/Sgt. Russell, or have reason to believe that D/Sgt. Russell was injured.

92.     At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper have reason to believe that he was involved in a motor vehicle accident.

93.     At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper have reason to believe that there was a motor vehicle accident, which resulted in injury to D/Sgt. Russell.

94.    At no time prior to exiting, and while he exited, the BFCU parking lot, did Hasper have reason to believe that he was involved in a reportable motor vehicle accident, which would require him to exchange information or remain at the scene.

95.    Hasper left the bank parking lot that day to avoid, not create, a dangerous or unjustifiable risk. Hasper, with the assistance of Grady, left the BFCU parking lot in a cautious, slow, and controlled manner, with the intent to avoid injury to D/Sgt. Russell, and to avoid, not create, further confrontation between the two men.

96.    Accordingly, at the time Hasper exited the BFCU parking lot, he was unaware of, nor did he consciously disregard, a substantial or unjustifiable risk of causing serious physical injury to anyone at the scene.

97.    After Hasper drove down Old Country Road, D/Sgt. Russell stood on the roadway, looking eastbound down Old Country Road after Hasper's truck. D/Sgt. Russell then sprinting back to his car, got in, and then sped out of the parking lot in pursuit of Hasper.

98.    D/Sgt. Russell never activated the lights or siren in his unmarked vehicle, did not use the radio in his car, did not use a portable radio (in fact, he did not have one on him, in violation of the NCPD rules and procedures), and did not call 911 for assistance on any recorded line. While D/Sgt. Russell did call the Third Precinct on his cell phone, that was yet another violation of the NCPD rules and procedures.

## THE FALSE NARRATIVE DEFENDANTS KNOWINGLY CONCOCTED TO CREATE THE APPEARANCE OF PROBABLE CAUSE, IN ORDER TO JUSTIFY HASPER'S UNLAWFUL ARREST AND PROSECUTION

99.    D/Sgt. Russell was unable to locate Hasper's truck, so he returned to the BFCU parking lot. He had called the Internal Affairs Unit, where he was assigned, and requested that a colleague run the license plate number from Hasper's truck.

100.    D/Sgt. Russell also called Inspector Nicholas Stillman, the Commanding Officer of the NCPD Internal Affairs Unit. The NCPD Internal Affairs Unit reports directly to the Office the Police Commissioner, and therefore, Inspector Stillman wields tremendous authority as a high-ranking officer.

101.    Inspector Stillman called Det. Ryan M. Lunt, who was assigned to the Third Squad on February 15, 2019, and told him that one of his guys was involved in an incident at the BFCU parking lot.

102.    Numerous police personnel, including high ranking officials, responded to the BFCU. The following are some of the police personnel who responded: Lt. Valerie F. Troise, the Officer in Charge of the Third Precinct; D/Sgt. Nabil ('Bill') Hussain, the supervisor of the Third Squad detectives assigned to this case; Det. Lunt, the carrying detective in this case; and Det. Vincenzo

Vacchiano, Det. Thomas Roche, Det. Barry Purcell, and Det. Jonathan Panuthos, the other detectives who were part of the Third Squad investigating team assigned to this case.

103. D/Sgt. Russell had previously been assigned to the Third Squad, for approximately 10 years, and all those who responded to the scene knew him well.

104. Prior to the police response to the BFCU parking lot, D/Sgt. Russell was walking around normally, without indicating any pain or discomfort. However, as the police personnel responded, Grady observed D/Sgt. Russell suddenly start limping about. D/Sgt. Russell was not injured, and he feigned a limp in order to pretend to be injured.

105. D/Sgt. Russell spoke with the police personnel who responded to the scene, and told them that Hasper was shouting and cursing at him, and struck him with his truck. D/Sgt. Russell told them that Hasper pissed him off, and he wanted Hasper locked up.

106. The police personnel at the scene, including all individually-named defendants—D/Sgt. Russell, Det. Lunt, Det. Vacchiano, Det. Purcell, Det. Panuthos, Det. Roche, D/Sgt. Hussain, and Lt. Troise—discussed coming up with a theory, and how they were going to go about obtaining information, to support charging Hasper with various crimes, regardless of whether the actual facts supported these crimes.

107. Following this discussion in the BFCU parking lot, Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, entered the bank. They spoke with Grady, as well as with the bank's Assistant Branch Manager, Lorena Baez.

108. When these defendants approached Baez, they asked for "the video of William Hasper causing a problem in the bank." Baez however told them that there were no problems in the bank that day, and that she did not know what they were referring to.

109. Baez showed these defendants footage of the interior of the bank, and after these defendants had Grady identify Hasper on the video, she showed them the video for the timeframe when Hasper had come in and out of the bank. Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, observed Hasper calmly walking into the bank, approaching and briefly speaking with Grady, take and complete a deposit slip and wait in line for a few minutes, look toward the parking lot, and calmly approach Grady again and briefly speak with him on his way out.

110. Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, knew, from Baez as well as from the bank's interior security video, that contrary to D/Sgt. Russell's claim, Hasper was not loud and irrational. Rather, he was calm and collected.

111. Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, also spoke with Grady. When these defendants asked Grady about Hasper's yelling and cursing, Grady told them that Hasper was a gentleman and behaved normally, and that the other individual was the one who was cursing and screaming and causing problems. Grady told them that the other individual was angry and yelling, was looking for trouble, and looked like he

wanted to fight. Grady told them that as Hasper left the bank, Hasper asked him for help. On the other hand, when the other individual was trying to stop Hasper from leaving, Grady yelled at him to get out of the way because the other individual had no right to stop Hasper from leaving, however this other individual would not listen to him. Grady told these defendants that Hasper was just trying to leave, and he was careful not to hit the other individual. When they mentioned to Grady that this other individual was a cop and referenced D/Sgt. Russell identifying himself as such, Grady told them that this individual never said he was a cop, never presented a shield, and that no one knew that individual was a cop.

112.  Based upon the information they obtained from Grady, as well as from Baez and the security video she showed them, Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, knew that the claims D/Sgt. Russell had made—that he had identified himself as an officer but that Hasper was hostile and irrational and struck him with his vehicle—were false.

113.  When they existed the bank, Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and, upon information and belief Lt. Troise, discussed the information they obtained from Grady, Baez, and the video she showed them, with the other NCPD personnel who were present in the parking lot.

114.  All individually-named defendants knew that Grady was the only eye-witness to the incident in the parking lot and that his account of the incident clearly demonstrated that Hasper did not commit any crimes or violations. Therefore, they all knew that based upon Grady's account, there was no probable cause to arrest or charge Hasper.

115.  Additionally, all individually-named defendants knew that Grady was an unbiased witness, and is therefore deemed to be inherently trustworthy as a matter of law. Therefore, they knew that if Grady's account contradicted D/Sgt. Russell's version of the events, which they all knew it did, then it was unreasonable to believe that D/Sgt. Russell was telling the truth as his veracity was called into question. Accordingly, they knew that D/Sgt. Russell's claims therefore could not support a finding of probable cause to arrest and/or charge Hasper.

116.  Accordingly, to create incriminating evidence as D/Sgt. Russell and the other individually-named defendants had discussed doing prior to Baez's and Grady's interviews, and to ensure that the "evidence" they "gathered" corroborated, and did not contradict, the factual account they discussed and agreed to attribute to D/Sgt. Russell, Defendants intentionally failed to make any record of the information provided to them by Baez, and Det. Lunt wrote out a supporting deposition in which he knowingly inserted false incriminating information against Hasper which Defendants attributed to Grady, and they omitted critical facts Grady provided to them which would have indicated that Hasper did not commit any crime that day.

117.  Based upon his agreement with the other individually-named defendants, Det. Lunt included the following information in the supporting deposition they attributed to Grady:

> As he walked into the parking lot, I observed the male get into a
> black pickup truck which was parked in a parking spot closest to the
> bank. I then saw a male white with black hair and glasses wearing a

dark colored suite standing behind the other male white's black pickup. It appeared that the male white in the suit was trying to prevent the male in the black pickup from leaving. I saw the black pickup then reverse and intentionally bump into the male white in the suit multiple times until he pushed him out of the way. I then saw the male white in the suit go to the front of the pickup to prevent the pickup from leaving and again I saw the pickup being operated by the same male white in the bank intentionally bump the male white in the suit. I yelled to the man in the suit to "let him go" because I was afraid he was going to get run over. After the incident occurred, I reviewed the video surveillance system and confirmed that the same guy in the bank video is the same guy who came up to me, got in dark colored pickup truck and intentionally strike the male white in the suit. . .

*See* Exhibit E.

118.  Defendants all ensured that this fabricated Supporting Deposition which they attributed to Grady, was submitted to the Nassau County District Attorney's Office ("NCDA") as part of the criminal file against Hasper. Because the fabricated Supporting Deposition was supposedly given by an unbiased eye-witness who, according to the document, witnessed Hasper intentionally strike D/Sgt. Russell multiple times, it greatly impacted the NCDA's assessment as to Hasper's guilt, and directly resulted in the NCDA acquiescing in the charges Defendants brought against Hasper and ultimately presenting the case before a grand jury.

119.  While Det. Lunt was the one who personally wrote the false statement which was attributed to Grady, all individually-named defendants participated in fabricating Grady's supporting deposition. They all discussed the incident, agreed on the false story they were going to spin, discussed the false information they were going to attribute to Grady, and prior to Det. Lunt writing out the false statement itself, all individually-named defendants agreed to the false content contained therein. They did so because they all shared a common goal, and were jointly involved in a common scheme, to ensure that Hasper was falsely arrested and prosecuted.

120.  Det. Lunt, Det. Vacchiano, D/Sgt. Hussain, and Lt. Troise did not give Grady an opportunity to read the statement prior to having Grady sign it. Rather, Det. Lunt merely directed Grady to sign the statement.

121.  Grady was 22 years old at the time, and was therefore a relatively young and inexperienced security guard. He believed that the police personnel he spoke with would honestly and accurately record his eyewitness account of the events. Additionally, these defendants spoke with Grady during lunchtime, the busiest time of day at the bank, and Grady was the only security guard on duty at the time the defendants spoke with him and asked him to sign the supporting deposition. Therefore, he was unable to devote his complete attention to them and the statement they had prepared. Therefore, Grady signed where he was told to sign, without having first read through the statement.

122.  Grady read through the false statement he was told to sign, for the first time in January 2020.

123.  Thereafter, on January 6, 2020 prior to the commencement of Hasper's criminal trial, Grady personally hand-wrote the following letter to the Honorable Christopher Quinn, the presiding Judge in Hasper's criminal prosecution, which Grady signed and swore to before a notary public:

01/06/2020                                         Page 1 of 3

Dear Judge Quinn,
I am Cameron Grady. I wanted to tell you my concern[ ] about dealing with the [N]assau Police. The Police came to my mother's house 11p.m.
I don't want them coming back. I Just want to go to court and tell the truth at trial. The truth is that I did not write that Form that they call 32 - B. The Police wrote it while I was busy working on my shift. They did not even have me read it. They Just told me to sign it. I thought they wrote what I said, but they added things that I didn't say. For example they wrote 3 times that [H]asper intentionally struck the guy in the suit. I never said that and he never struck him. The guy in the suit was the one acting all crazy. Hasper was a gentlem[a]n and was calm the whole time. The guy in the suit stood behind the truck, Hasper was carefully trying to leave. Then guy in the suit ran around the passenger side oF truck and stood inFront oF it. He had his cell phone in hand look like

[signature]

Page 2 of 3
he was trying to take picture oF the truck. At no time did guy in suit have his Badge in hand. It was his cellphone. The guy in the suit did not Identify himself to [H]asper and me as a police oFFicer. The first time and only time he mention he is a cop is aFter [H]asper left in his truck. The guy in suit ran back to his car to follow [H]asper's truck. He started to limp only aFter the Police showed up. Another thing that is not honest in Statement is where they wrote that the reason I was yelling at the guy in suit was to leave [H]asper alone, because I was scared that he would get ran over. OFcourse I wouldn[']t want nobody to get ran over on my shiFt. The reason I was yelling For him to leave him alone because he was Jumping inFront man[']s car not letting him leave and that[']s not right you are not supposed to do that. When the guy in suit Jumped in Front of the truck [H]asper was careFul as he was trying to leave Parking lot. Nobody knew this guy was a Police Officer. He seemed to me to be a aggressive guy looking For Fight.

[signature]

17

I don[']t know [H]asper, his investigator or his lawyer. Noone
threaten me or gave me anything to write this letter. I just wanted to
tell you these thing in my own words. I want to tell you everything
in Court and I don't want Police to harass me or my mother.


Today[']s Date is January 6, 2020.
  [Signature]
Cameron Grady


[Notarization appears below signature]

*See* Exhibit F.

124.  At approximately 4:30 PM, Hasper returned to the BFCU to conduct his banking,
believing that the events from earlier in the day were over. When he returned, he spoke with
Grady, who told him, for the first time, that the guy was a cop, and that numerous police
personnel had responded after Hasper left. Hasper asked what happened, and Grady told him
what he, Grady, told the police personnel who had spoken with him earlier, as described in
Paragraph 111, above.

125.  While speaking with Grady, Baez approached and asked to speak with Hasper. She told
him that three detectives interviewed her, and that they had asked for Hasper by name. She told
Hasper what she had told the police personnel who interviewed her, as described in Paragraphs
108 and 109, above. She emphasized the fact that she had stressed to the police that Hasper had
not caused any problems. Baez also told Hasper that she had spoken with the Alex Barahona,
who had opened Hasper's account four days earlier, who said that Hasper 'was a gentlemen and
really nice guy.' Baez told Hasper that she showed the bank's interior video to the police
personnel, and she then played that same video for Hasper to see. Baez emphasized that
according to the bank's personnel present earlier in the day, Hasper had done nothing wrong. She
asked if Hasper wanted to file an incident report against D/Sgt. Russell, however Hasper
declined, wanting to put this incident behind him.


### DEFENDANTS' ATTEMPTS TO HARRASS, HUMILIATE, AND UNLAWFULLY ARREST HASPER ON FEBRUARY 15, 2019

126.  Hasper left the bank at approximately, or just after, 5:00 PM. When he got into his truck,
he noticed two missed calls—one at 4:58 PM and the other at 5:00 PM. Det. Lunt had called
Hasper twice, and left a voicemail for Hasper to return his call at (516) 573-6353.

127.  After D/Sgt. Russell had called to report the incident earlier in the day, Defendants were
quickly able to confirm Hasper's identity through his license plate number which D/Sgt. Russell

provided, his vehicle registration information, observing him on the bank's interior security video, as well as through Baez and Grady.

128.  Defendants quickly ran a complete search on Hasper, and learned not only his relevant pedigree information including where he lived and whom he lived with, but that he was a retired Lieutenant from the SCPD, and that he was former military. Defendants then contacted the SCPD and confirmed this information. At that moment, Defendants all knew that Hasper was not a flight risk, and posed no immediate threat to anyone.

129.  Despite that, Det. Lunt, Det. Vacchiano, Det. Purcell, Det. Panuthos, and D/Sgt. Hussain, along with other uniformed Police Officers whose identities Plaintiff does not yet know, responded en masse to Hasper's home address.

130.  When they descended on Hasper's home, they quickly realized that no one was home. Despite the fact that they had reliable information from multiple sources to confirm that it was in fact Hasper's home address, the defendants present at that time decided to humiliate Hasper and his family in front of his neighbors, as retribution for 'messing' with D/Sgt. Russell—one of their own—and interviewed the community supervisor of Hasper's complex, Becky Connors, about him.

131.  At 5:06 PM, Hasper returned Det. Lunt's call. A female detective answered the phone, and advised that Lunt was out of the office but to call him on his cell phone at (516) 660-3238. At 5:08 PM, Hasper called the cell phone number provided to him, and thereafter he spoke with Det. Lunt for approximately 22 minutes.

132.  Hasper introduced himself, and asked Det. Lunt why he was calling. Det. Lunt told Hasper that he was at Hasper's home, and wanted to meet with him. Hasper explained he was unavailable at that moment because he had a pre-arranged meeting, and asked Det. Lunt, "What's this all about?" The following paragraphs describe some of they key points discussed during that telephone conversation.

133.  Det. Lunt told Hasper that he wanted to speak with him about an incident that happened earlier in the afternoon at the BFCU, and to get Hasper's version of the events. Having already spoken with Grady and Baez following the incident, Hasper asked Det. Lunt if the other individual was a cop, to which Det. Lunt responded that the guy was Detective/Sergeant assigned to the Internal Affairs Unit. Det. Lunt told Hasper that according to D/Sgt. Russell, D/Sgt. Russell had identified himself as a cop, however despite that, Hasper cursed him out, and upon leaving the parking lot struck D/Sgt. Russell with his vehicle.

134.  Hasper told Det. Lunt that what D/Sgt. Russell claimed was "crazy." He told Det. Lunt that the guy was completely out of control, and was acting totally irrationally. Hasper stated that all he had done was beep his horn at D/Sgt. Russell because the guy was blocking the entrance to the parking lot, however D/Sgt. Russell then approached and initiated a verbal confrontation, stating "Hey asshole, do we have a problem here?!" Hasper told Det. Lunt that at no point did the guy identify himself as an officer, and that "you and I both know, if he identified himself as a cop, I would have identified myself and displayed my shield, which would have resolved the

matter." Hasper also told Det. Lunt that nowhere in police training do they teach you to block a vehicle with your body, and that a cop would not have intentionally placed himself behind, or in front of, a moving vehicle.

135.   Hasper also told Det. Lunt that at no time did he make contact with D/Sgt. Russell—not physically with his body, and not with his vehicle. Hasper told Det. Lunt that he was driving a full-size GMC pickup truck, and that if he had struck D/Sgt. Russell with it, D/Sgt. Russell would have been injured. However, he told Det. Lunt, D/Sgt. Russell was not injured, and in fact as Hasper drove down Old Country Road he watched D/Sgt. Russell through his rearview mirror, and observed D/Sgt. Russell sprint back to the parking lot.

136.   Hasper also told Det. Lunt that after he had entered the bank and filled out a deposit slip, he observed D/Sgt. Russell through the bank's window, standing by the handicapped spot with his arms crossed like someone who was looking for a problem. Hasper told Det. Lunt that his entire time while in the bank was captured on the bank's internal security system, which the bank's manager, Lorena Baez, had shown to him. He further told Det. Lunt that both Baez and the bank's security guard, Cameron Grady, told Hasper on his return to the bank just prior to this phone conversation with Det. Lunt, that they had told the police that Hasper had not caused any problems. Rather, Hasper told Det. Lunt that Grady told the police that D/Sgt. Russell was the one causing a problem. Hasper also told Det. Lunt that Baez stated that she showed the police the same video footage she had shown to Hasper. Hasper told Det. Lunt that in fact Baez had asked if Hasper wanted to file an incident report against D/Sgt. Russell, but that Hasper had declined.

137.   Hasper told Det. Lunt that he had spoken with the bank's security guard, Cameron Grady, twice—once upon entering the bank to apologize for any commotion Grady may have heard, and again on his way out to tell Grady that the guy outside was looking for trouble and Hasper wanted to deescalate any problems by leaving. Hasper told Det. Lunt that on his way out of the bank, he asked Grady to "watch my back" as he walked toward his car.

138.   Hasper reiterated that D/Sgt. Russell was lying about identifying himself as cop, and was likewise lying about Hasper's vehicle striking him. Rhetorically, Hasper asked Det. Lunt the following: "Listen to what Russell is telling you—it does not make sense. Why would a career police Lieutenant intentional strike and injure a fellow police officer, and then leave the scene, over a simple verbal argument? Does that make any sense to you at all?" Hasper asked Det. Lunt to please double check with his supervisors in the NCPD regarding D/Sgt. Russell's claimed account of the incident, because everything that D/Sgt. Russell claimed had happened, was wrong. Det. Lunt agreed to do that, and advised that he would call Hasper back the following day.

139.   Following his call with Hasper, Det. Lunt conferred with the other defendants, and relayed to them what Hasper had told him. Despite Det. Lunt having told Hasper that he would follow up with him the next day, Defendants all agreed to move forward and have Hasper arrested that day. They did so despite the fact that they all knew they had no probable cause to arrest Hasper. Additionally, they all knew that at the very least, given Grady's account (which corroborated what Hasper had told Det. Lunt), they had a duty to further investigate prior to arresting and charging Hasper.

140.  Defendants, however, were not particularly concerned with the true facts of what had occurred. Rather, they all agreed upon the following story which they all knew was materially false—as D/Sgt. Russell was waiting for a parking spot to open up, Hasper started beeping his horn excessively at him, and was gesturing and cursing at him. Once a spot opened up, D/Sgt. Russell pulled in, and Hasper then went into the handicap spot. While D/Sgt. Russell was exiting his car, Hasper continued yelling and cursing at him. D/Sgt. Russell therefore approached Hasper's truck, identified himself as a sergeant and displayed his shield, told Hasper that he had called for a patrol car to respond and investigate, and that Hasper was not free to leave. Hasper continued cursing at D/Sgt. Russell, and went into the bank. Hasper exited the bank shortly thereafter and walked to his truck. As he did so, D/Sgt. Russell again identified himself as a sergeant and told Hasper that he was not free to leave. However, Hasper continued cursing at him, and entered his truck. D/Sgt. Russell then stood behind Hasper's truck to prevent him from leaving, therefore Hasper backed into him and struck him with the truck several times. D/Sgt. Russell then went to the front of Hasper's truck to prevent him from leaving and identified himself as an officer again, and Hasper then struck him several more times and fled the scene.

141.  At 7:07 PM, Hasper received a voice message from Det. Roche, requesting that Hasper call him on his cell phone at (516) 660-3238, or at the Third Squad at (516) 573-6354. Hasper called Det. Roche on his cell at 7:24 PM, but reached Det. Roche's voicemail.

142.  At 7:25, Hasper called the Third Squad, and spoke with Det. Roche for approximately three minutes. Det. Roche advised Hasper that he was being arrested tonight, and that he must surrender immediately. Hasper advised Det. Roche about his lengthy conversation with Det. Lunt regarding the incident, that he did nothing wrong and was innocent of any alleged crimes, and that Det. Lunt agreed to look into Hasper's account and determine whether Hasper's version could be corroborated, and that Det. Lunt said that he would get back to Hasper the following day. In response, Det. Roche told Hasper that he was aware of the conversation with Det. Lunt but that there had been a change in plans and that regarding waiting until the following day to make a determination, "that is not happening," and Hasper was being arrested tonight.  Hasper once again professed his innocence, and asked Det. Roche to please reconsider looking into the underlying facts of the case before making an erroneous decision and arresting a career law enforcement officer. Hasper asked if he could call Det. Roche back, and Det. Roche agreed.

143.  Based upon Grady's account (corroborated in part by Baez, and D/Sgt. Russell himself), Defendants had no probable cause to believe that Hasper committed any crimes that day. Additionally, Defendants could not rely upon D/Sgt. Russell's account of the incident to support probable cause, given that Grady, an unbiased eye-witness deemed inherently credible, created doubts as to D/Sgt. Russell's veracity. Furthermore, they knew that their fabricated account of the incident could not provide probable cause, either. Therefore, and additionally, under the totality of the circumstances it was unreasonable for Defendants to arrest Hasper prior to further investigating the matter. Defendants also knew that Hasper was not a flight risk, given that they knew that Hasper, and his family, were career law enforcement officers and former military, and long-term residents of Long Island. However, they wanted to arrest Hasper immediately out of malice, as retribution for pissing off D/Sgt. Russell.

144. Knowing they had no probable cause to arrest and criminally charge Hasper, Defendants did not obtain a warrant for his arrest.

145. Despite that, Det. Roche, John Doe No. 1, and John Doe No. 2, as well as other police personnel, went back to Hasper's home to secure this unlawful arrest.

146. Between 9:55 PM and 10:02 PM, Hasper's partner, Lia Todoran, called Hasper several times to tell him that she became alarmed by noises outside the house, and by what appeared to be flashlights shining at the windows. Hasper advised her that if anything further develops, to call him back and/or to call 911.

147. NCPD personnel then started banging on Hasper and Ms. Todoran's door, yelling "Nassau Police! Open up!" Despite Hasper's cooperation, and despite the fact that Defendants did not secure a warrant for his arrest, they intentionally made a scene late at night outside his home, in order to further harass and embarrass him in front of his neighbors. Not wanting to draw attention by the banging and shouting outside her door, Ms. Todoran then started walking down the stairs toward the door, stating "Hold on, I will be right there."

148. When Ms. Todoran opened the door, Det. Roche, John Doe No. 1, and John Doe No. 2, pushed their way into the home, without consent, without a warrant, and without the existence of any exception to the warrant requirement. One of two detectives—Det. Roche or John Doe No. 1—started questioning Ms. Todoran, demanding to know whether Hasper was home—she stated he was not; demanding to know if she was Hasper's wife—she stated she was his significant other; and demanding to know when she last saw or spoke with Hasper—she responded words to the effect, 'excuse me, but who are you and what is this all about?'

149. At this point, the detective who was questioning Ms. Todoran, stated, in a forceful and intimidating manner, that they were the ones asking questions, not her. Ms. Todoran responded that they woke her up, she was uncomfortable with them being in her house, Hasper was not home, she did not believe they were allowed to be there, and she wanted them to leave.

150. The detective responded, again in a forceful and intimidating manner, that they were not leaving until Hasper got home, and she must answer their questions. They asked Ms. Todoran if Hasper had a safe in the house, and whether he had any handguns, rifles, or shotguns. She again responded that she was not comfortable speaking with them.

151. While this detective was questioning Ms. Todoran about Hasper's guns, the other two defendants were walking around and looking through the adjacent rooms of her home. The detective continued to press Ms. Todoran about the guns, and as she continued stating that she was uncomfortable speaking with them, she started backing away from them, into the kitchen.

152. These defendants then demanded that Ms. Todoran retrieve her cell phone and call Hasper immediately, in their presence. She protested, however after they reiterated that they were not leaving until Hasper came home; she finally acquiesced.

153.  Ms. Todoran called Hasper at 10:25 PM, and told him that the police were in their home. She then handed the phone to Det. Roche. Det. Roche asked Hasper where he was, and demanded that Hasper come home immediately. Hasper confronted Det. Roche, and asked if he "had a warrant," to which Det. Roche responded, "I don't need one." Hasper then told Det. Roche that he had no right to be in his home unless he had a warrant, and asked him to please leave. Det. Roche refused to do so, and in a demanding and condescending manner, told Hasper, "Listen pal, we are standing in your kitchen waiting for you, and we are not leaving until you come home. We have all night!" Hasper responded by stating that his lawyer, Brian Davis, would be calling Det. Roche right back on Ms. Todoran's cell phone, and Hasper then hung up the phone.

154.  Following Hasper's earlier conversation with Det. Roche, when he was told that is being charged and must surrender, Hasper started making calls to retain a criminal defense attorney, and he ultimately retained Brian J. Davis, Esq. When Ms. Todoran called Hasper at 10:25 PM, Hasper had been on the other line with Mr. Davis, and when Hasper hung up the phone on Det. Roche, he switched back to his call with Mr. Davis.

155.  Mr. Davis called Ms. Todoran's cell phone at 10:28 PM, and spoke with Det. Roche for approximately four minutes. Ms. Todoran overheard Det. Roche arguing with the attorney on the other end of the call, in a nasty and arrogant tone, that they weren't going anywhere until Hasper returned home.

156.  Knowing that Ms. Todoran's cell phone was in use at the time, Hasper called Ms. Todoran on their home phone at approximately 10:31 PM, and he, too, was able to hear Det. Roche arguing with Mr. Davis.

157.  Mr. Davis then spoke with Hasper again, and following that conversation, at approximately 10:40 PM, Mr. Davis called Det. Roche back on Ms. Todoran's cell phone. Mr. Davis told Det. Roche to get out of Hasper's home, that Hasper was not surrendering that night, and Mr. Davis would call them back the next day to arrange a surrender. Finally, and presumably because these defendants knew their actions were clearly unlawful and unconstitutional and an attorney was now involved, Det. Roche agreed to leave.

158.  At approximately 10:44 PM, Ms. Todoran called Hasper to let him know that the police were finally leaving their home.

159.  In total, Det. Roche, John Doe No. 1, and John Doe No. 2, unlawfully entered, and then unlawfully remained, in the home for at least a half hour. They did so without consent and despite the express protests of its residents, without a warrant, and without meeting any of the clearly established exceptions to the warrant requirement under the United States, and New York State, constitutions and laws. These defendants did so out of malice, and in order to harass and intimidate Hasper and his family, as retaliation for pissing off D/Sgt. Russell.

## DEFENDANTS' CREATION OF ADDITIONAL FABRICATED EVIDENCE
## IN ORDER TO JUSTIFY HASPER'S UNLAWFUL ARREST AND PROSECUTION

160.  At some point on February 15, 2019, prior to and/or after Det. Roche, John Doe No. 1, and John Doe No. 2, responded to Hasper's home at about 10:00 PM with the intention of unlawfully arresting him, all individually-named defendants knew that there was no probable cause to arrest or charge Hasper. Accordingly, after initially discussing their plan of action while outside the BFCU, intentionally failing to note the information obtained from Baez and the security video she showed them, and fabricating the supporting deposition which they had Grady sign, all individually-named defendants discussed the incident again over, solidified the false account they were going to spin, and fabricated additional documents and information to support the false narrative they created.

161.  Defendants wanted to charge Hasper with the most severe charges possible under their version of the events. After discussing the incident and the potential charges they thought they could get away with filing, they all agreed to charge Hasper with felony assault on a police officer—Assault in the Second Degree in violation of New York Penal Law § 120.05(3), a class D violent felony, and leaving the scene of an incident involving personal injury without reporting in violation of Vehicle and Traffic Law § 600(2)(a), a class A misdemeanor.

162.  A person is guilty of violating Penal Law § 120.05(3) when, as relevant to this case, he knows that an individual is a police officer, the police officer is in the process of performing a lawful duty, the individual acts with the specific intent of preventing this police officer from performing a lawful duty, and in the course of those action, causes more than a minor injury to that police officer.

163.  A person is guilty of violating Vehicle and Traffic Law § 600(2)(a) when, as relevant to this case, he has reason to believe that an individual sustained personal injury due to an incident involving a motor vehicle which he was operating, and failed to stop and provide certain personal information.

164.  D/Sgt. Russell and the other defendants all knew that D/Sgt. Russell had not identified himself as an officer, and that therefore Hasper (nor Grady) knew that D/Sgt. Russell was an officer. Likewise, they knew that D/Sgt. Russell was not only *not* engaged in any lawful duty at the time, but that he was acting irrationally, and was screaming and cursing. They also knew that Hasper's truck never struck D/Sgt. Russell, and that D/Sgt. Russell was therefore not injured by Hasper's truck. Accordingly, they all agreed to continue creating false evidence to support the false charges against Hasper.

165.  Defendants fabricated numerous documents, some of which are discussed below, to ensure that Hasper was unlawfully arrested and prosecuted for crimes and violations they knew he did not commit. While some defendants may not have physically put pen to paper as to certain documents which were fabricated, every defendant nonetheless participated in the fabrication, as they were all aware that documents were fabricated in order to secure Hasper's unlawful arrest and prosecution and thereby restrict his liberty, and they all had the opportunity to intervene and prevent the violation of Hasper's constitutional rights. However, each individual defendant failed

to do so, because they all shared a common goal, and were jointly involved in a common scheme, to ensure that Hasper was unlawfully arrested, prosecuted, and deprived of his liberty.

166.  Each individually-named defendant could have intervened thereby preventing Hasper from being charged and prosecuted unconstitutionally—they could have exposed the others' unconstitutional acts or, at the very least, advised the NCDA that the account was fabricated. They each failed to intervene, despite their ability to do so. They failed to do so because all individually-named defendants shared a common goal, and were jointly involved in a common scheme, to ensure that Hasper was falsely arrested and prosecuted.

167.  Lt. Troise completed a New York State Department of Motor Vehicles Police Accident Report on February 15, 2019, and in it, knowingly recorded false information to address several elements of the false charges against Hasper—the fact that D/Sgt. Russell was a police officer, Hasper's knowledge that D/Sgt. Russell was engaged in a lawful duty, Hasper's actions to prevent D/Sgt. Russell from engaging in that lawful duty, injury to D/Sgt. Russell caused by Hasper's truck, and Hasper fleeing without stopping to provide the necessary information. Lt. Troise also omitted references to all true facts which would undermine this false account. She wrote the following:

> Pedestrian Russell was on duty as a Detective/Sergeant with the Nassau Police Department and was attempting to take police action against Driver Hasper. Driver Hasper did back his vehicle into Pedestrian Russell. Pedestrian Russell walked to the front of Driver Hasper's vehicle, at which time Driver Hasper did strike Pedestrian Russell with the front of his vehicle. Driver Hasper then fled the scene.

*See* Exhibit G.

168.  Plaintiff believes that Lt. Troise's false Police Accident Report contains the first recorded reference to the fabricated assertion that D/Sgt. Russell was engaging in a lawful duty—"was attempting to take police action." *See id.*

169.  While Lt. Troise was the one to complete the Police Accident Report, it was completed based upon the agreed-upon 'facts' which Defendants had all determined together, and therefore, all Defendants participated in creating this false document.

170.  Defendants all ensured that the Police Accident Report was forwarded to the NCDA as part of the casefile on Hasper. The prosecutor then relied upon the materially-false information contained therein, and its consistency with Defendants' overall theory of the incident, and used that information in prosecuting Hasper.

171.  As noted above, Hasper's truck never come into contact with either of D/Sgt. Rusell's legs or feet, and D/Sgt. Russell was not injured during the incident. In fact, after Hasper left the parking lot, D/Sgt. Russell is captured on the 7/11 security video sprinting back to his vehicle and getting in, with no apparent distress. Similarly, Grady later testified that only after police

personnel responded to the BFCU did D/Sgt. Russell suddenly start limping about and claiming that his right knee and right foot hurt.

172. Given D/Sgt. Russell's (false) claim that he was injured, an ambulance was called to the scene. D/Sgt. Russell's chief complaint was that "My knee hurts." *See* Exhibit H at 1. The medical personnel examined him, and found him to be alert and oriented, his vitals were normal, and critically, there were "no obvious signs of trauma." *See id.* At that time, D/Sgt. Russell refused medical treatment, refused to be taken to the hospital, and signed a Refusal of Treatment/Transportation Release. *See id.* at 2.

173. However, when Defendants discussed which crimes to charge Hasper with, they realized that in order to substantiate an assault-in-the-second-degree charge in violation of Penal Law § 120.05(3), they would need D/Sgt. Russell to have suffered a "physical injury" as defined by Penal Law § 10.00(9), meaning "impairment of physical condition or substantial pain," given that minor injuries, even if those did occur, did not suffice.

174. Therefore, as they were discussing the evidence they would need to substantiate the false charges against Hasper, they agreed that D/Sgt. Russell would go to the hospital and complain of an injury to his foot, and thereby, create documents to support a Penal Law § 120.05(3) charge.

175. Less than two months prior to this incident, on December 22, 2018, D/Sgt. Russell fell off a motorcycle and sustained a displaced fracture to his right foot at the third metatarsal. Defendants all knew that D/Sgt. Russell had fractured his right foot, that his foot was still in the process of recovering from that injury, and that his foot would therefore show evidence of an injury having occurred.

176. As per the agreement he reached with the other defendants to feign a physical injury to his foot, D/Sgt. Russell checked into Nassau University Medical Center's emergency department on February 16, 2019, at 11:59 AM, and complained of pain to his right knee and foot due to being struck by a vehicle. D/Sgt. Russell claimed that he reaggravated or refractured his prior December 22, 2018 fracture. He was discharged a mere one and a half hours later.

177. Defendants all ensured that D/Sgt. Russell's medical records were forwarded to the NCDA as part of the casefile on Hasper. The prosecutor then used D/Sgt. Russell's medical records, and the information contained therein, against Hasper to attempt to establish that D/Sgt. Russell suffered a physical injury on February 15, 2019.

178. While the other defendants did not physically participate in creating the fabricated medical records which would later be used against Hasper, they all participated in creating that false evidence. They all participated in the determination to have D/Sgt. Russell go to the hospital to report an injury they knew did not exist, and, they all failed to intervene and expose the truth to prevent Hasper from being falsely arrested and prosecuted, despite their ability to do so. Defendants did so because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper was falsely arrested and prosecuted.

179.  To Further support the claimed injury, Defendants agreed that D/Sgt. Russell would be out on sick leave for several days. Toward that end, they had the appropriate forms completed and filed with the NCPD and the NYS Workers' Compensation Board, each of which contained false information asserting that D/Sgt. Russell was injured while acting in the scope of his official duties, in that while he attempted to detain Hasper, Hasper intentionally struck him and injured his right foot and knee.

180.  Additionally, in the days following the incident, Defendants participated in preparing additional fabricated documents which would support, and would not contradict, the false narrative they had agreed to, particularly regarding D/Sgt. Russell's feigned injury.

181.  Whenever a NCPD officer is injured, a PDCN 206 packet must be completed, which details information pertaining to the injury and how it occurred. In addition to form PDCN 206, itself, several other forms accompany the PDCN 206 packet, depending upon the circumstances of the injury and how it occurred.

182.  Defendants all knew that these documents would be discoverable in a criminal prosecution, and indeed, the prosecutor disclosed the PDCN 206 packet in this case as part of the discovery in Hasper's criminal prosecution. Defendants all knew that in order not to undermine the false charges against Hasper, the information contained in the PDCN 206 packet would have to mirror the false allegations they had come up with.

183.  Accordingly, they ensured that the PDCN 206 packet contained that fabricated information. For example, it stated that "Sgt. Russell, while attempting to detain defendant to issue VTL summons' [sic] was intentionally struck by defendant's vehicle. Defendant did flee the scene in his vehicle." It also stated, in several locations, that D/Sgt. Russell sustained pain to his right foot and knee. It further stated that D/Sgt. Russell was acting within the scope of his official duties at the time, used all available safety equipment, and that he did not violate any NCPD rules.

184.  One of the forms which must be submitted in conjunction with the PDCN 206 packet, is form PDCN 206A, an Incident/Accident Statement which contains a narrative of the incident, signed by the injured officer. Defendants participated in preparing a false narrative for D/Sgt. Russell's signature, despite knowing that the information contained therein was fabricated. The Incident/Accident Statement indicates that the statement therein was prepared on February 18, 2019, and it contains, in greater detail, the fabricated account which Defendants had come up with. *See* Exhibit I. D/Sgt. Russell ultimately signed another copy of this false statement which detailed how his 'injury' occurred, this time without it being contained in form PDCN 206A, and dated it April 17, 2019, *see* Exhibit J, and it, too, was submitted to the NCDA.

185.  However, Dr. George Ackerman, M.D., D/Sgt. Russell's treating orthopedic, ultimately admitted on cross-examination during Hasper's subsequent criminal trial, that there was no objective medical evidence to support a finding that D/Sgt. Russell had sustained a physical injury on February 15, 2019. D/Sgt. Russell's foot had been x-rayed on February 11, 2019 due to his December 2018 injury, four days prior to this incident, and it was x-rayed again on February

20, 2019, five days after this incident. Dr. Ackerman acknowledged that the x-rays were identical, and that "[f]rom a radiographic standpoint," that would "militate against a refracture."

186. Hasper also called a medical expert to testify at his criminal trial—Dr. John P. Reilly, M.D. Dr. Reilly likewise testified that D/Sgt. Russell did not suffer a physical injury during the incident with Hasper on February 15, 2019.

187. Defendants also wanted to tighten up their theory as to the claimed 'lawful duty' D/Sgt. Russell was engaged in, and they amended their theory on this element several times.

188. Initially, they claimed that D/Sgt. Russell had told Hasper he was not free to leave because he, D/Sgt. Russell, was calling a patrol car to 'investigate' Hasper. They claimed that D/Sgt. Russell made that statement to Hasper *before* Hasper allegedly backed up and struck D/Sgt. Russell. Realizing that this theory was, at best, a stretch, Defendants changed their story to something a bit more straightforward, and decided that the 'lawful duty' D/Sgt. Russell was engaged in, was attempting to issue traffic summonses to Hasper for Vehicle and Traffic Law violations which D/Sgt. Russell supposedly observed Hasper commit.

189. To support that new, and false, narrative, Defendants all agreed that D/Sgt. Russell would complete traffic summonses. Toward that end, D/Sgt. Russell completed three traffic summonses, falsely alleging that Hasper obstructed his rear license place in violation of VTL § 402(1)(b), used his horn excessively in violation of VTL § 375(1)(a), and made an unsafe left turn in violation of VTL § 1163(a). *See* Exhibit K. Of course, D/Sgt. Russell, as well as the other defendants, knew that Hasper did not commit any of those violations, and that the charges were fabricated.

190. While the traffic summonses are dated February 15, 2019, Plaintiff has reason to believe that they were in fact prepared at a later date but that the tickets were backdated, in itself a fabrication, to support the false claim that D/Sgt. Russell communicated to Hasper, on February 15, 2019, that a patrol car was on the way to issue him those tickets.

191. At approximately 7:39 PM, a mere 11 minutes after Det. Roche initially directed Hasper to surrender but Hasper refused. Det. Roche, in consultation with the other defendants, issued a false alarm to have Hasper and his truck unconstitutionally seized. They did so given that Hasper advised he would not be voluntarily surrendering at that time, and Defendants knew they had no legal basis to obtain a search warrant for the truck. Accordingly, they acted out of malice, and issued the false alarm to knowingly circumvent the warrant requirement.

192. The false alarm itself was issued by Det. Roche, however, he did so in conjunction with Det. Lunt, who documented the fact the alarm was issued in his memo book. To the extent that any defendant did not personally participate in the decision to issue the false alarm, they were all aware that Det. Roche had issued it. Accordingly, they should have, but failed to, act to withdraw or modify it so that Hasper's constitutional rights were not violated. They did not so however, because they all shared a common goal, and were jointly involved in a common scheme, to ensure that Hasper's person and property were unlawfully seized and searched.

193. The false alarm stated, in part, the following:

> FELONY VEHICLE - OCCUPANT(S) ARMED/HOLD FOR
> LATENTS
> OPERATOR WILLIAM HASPER DOB 11/03/1966 WANTED
> BY 3RD SQUAD . . . FOR ASSAULT ON PO BY MV HOLD MV
> FOR PRINTS AND EVIDENCE
>
> . . .
>
> Vehicle used in the commission of a crime; Occupant(s) armed
> and/or dangerous; preserve for prints

*See* Exhibit L. The false alarm also stated that the truck was stolen: "Date of Theft (DOT): 02/15/2019." *See id.*

194. Defendants all knew that this alarm was false. They all knew that Hasper was neither armed nor dangerous. In fact, Det. Lunt had confirmed to Hasper during their earlier approximately-22-minute conversation, that they all knew Hasper was a retired Lieutenant from the SCPD and a Nassau County resident, and that according to the bank employees and security video which some of the defendants had viewed, Hasper was calm and rational while at the bank. Det. Lunt had even agreed to follow up with Hasper the following day (or, so he lead Hasper to believe at the time), which is directly contrary to the spirit and content of the alarm which claimed that Hasper was a fugitive, was armed and dangerous, and that his vehicle was used in the commission of a violent crime against a police officer. Additionally, Defendants all knew that Hasper owned the truck, and that it was registered to him. Indeed, they had initially identified Hasper, in part, by running the license plate information off the truck which D/Sgt. Russell had provided to them from the parking lot.

195. Defendants all knew that the false alarm would result in Hasper's person and property being seized unconstitutionally—precisely the reason they disseminated it, to harass and intimate Hasper and to ensure that his person and property were unlawfully seized and searched, as retaliation for the verbal altercation he had with D/Sgt. Russell.

196. Based upon their training and experience, Defendants all knew that the false alarm would result in a felony car stop with Hasper held at gunpoint, that all occupants would be physically removed from the vehicle, and that they would all be handcuffed and searched.

197. On Saturday morning, February 16, 2019, Hasper retained Sapone & Petrillo, LLP, to represent him. Thereafter, William Petrillo, Esq., spoke with Det. Lunt about the case, and Det. Lunt agreed that the investigation would continue prior to the defendants requiring Hasper to surrender.

198. Later that same day, after D/Sgt. Russell had already gone to the emergency room to continue feigning an injury to his foot, Det. Lunt, Det. Vacchiano, Det. Purcell, and Det. Panuthos went back to parking lot where the incident had occurred, to canvass the area for

exterior video cameras. Of the four locations they visited, they located two cameras—a 7/11 located at 760 Old Country Road, just east of the BFCU, captured the events that took place in the BFCU parking lot in the top right corner of the camera's view, *see* Exhibit C, and the Laundry Stadium located at 751 Old Country Road, across the street from BFCU, caught some of the events on video. *See* Exhibit D.

199.  Det. Lunt, Det. Vacchiano, Det. Purcell, and Det. Panuthos viewed the video footage, which provided conclusive unbiased evidence directly refuting D/Sgt. Russell's version of the events, or, the version of events which Defendants attributed to D/Sgt. Russell—the basis of the felony assault on a police officer charge in violation of Penal Law §120.05(3), and the leaving the scene of an incident involving personal injury charge in violation of VTL § 600.2A. Additionally, these videos corroborated both Grady and Hasper's account of the incident.

## HASPER'S SURRENDER ON SUNDAY, FEBRUARY 17, 2019

200.  Despite the video evidence, at approximately 3:28 PM, Det. Lunt contacted Mr. Petrillo, and advised him that they were moving forward with Hasper's arrest. Defendants all agreed to have Hasper arrested and prosecuted despite the fact that they knew he did not commit any crime. Mr. Petrillo agreed to arrange Hasper's surrender for the following day, Sunday, February 17, 2019, at 9 PM.

201.  On Sunday, prior to Hasper's surrender, Det. Lunt contacted Edward Sapone, Esq., and asked him to voluntarily surrender Hasper's truck, stating that they wanted to examine it for evidence. Det. Lunt told Mr. Sapone that if the truck was clean, it would help, not hurt, Hasper. Mr. Sapone specifically denied Det. Lunt's request, and advised him that it would not be surrendered without a warrant. Mr. Sapone however told Det. Lunt that if a warrant was secured, to simply call him, and he would arrange to produce the truck.

202.  Defendants never obtained a warrant to seize and/or search the truck.

203.  From when the arrangement was made to have Hasper surrender, until shortly before his surrender the following day, Defendants discussed the incident again, and ensured that all fabricated documents necessary to support the false charges were properly prepared.

204.  In addition to the fabricated traffic summonses which D/Sgt. Russell had prepared, Det. Lunt completed an additional summons falsely charging Hasper with leaving the scene of an incident involving physical injury in violation of VTL § 600(2)(a), a class A misdemeanor. *See* Exhibit K at 2. At this time on February 17, 2019, there was no doubt in any defendant's mind that D/Sgt. Russell did not sustain an injury during his encounter with Hasper on February 15, 2019.

205.  At 9:00 PM on February 17, 2019, Hasper surrendered at the Third Precinct, and he was placed under arrest.

206.  Defendants, of course, intended to confine Hasper, and Hasper was very conscious of the confinement. Additionally, Hasper did not consent to the confinement. While Defendants did not have a legal basis upon which to arrest Hasper, he had only surrendered in an attempt to mitigate the injuries to him, particularly the additional humiliation he would have suffered if he were to be publicly arrested and handcuffed.

207.  While he was processed, Det. Lunt commented to Hasper that he, Hasper, "fucked with one of ours. Did you know that he [D/Sgt. Russell] worked in this precinct for 10 years?"

208.  Despite the complete absence of probable cause, Hasper was formally charged in a Felony Complaint bearing Arrest Number 2019NA005138, with the following crimes and violations:

> i.  Count 1: Assault in the Second Degree; Causing physical injury to a police officer while acting with the intent to prevent a police officer from performing a lawful duty, in violation of Penal Law § 120.05(3), a class D violent felony;

> ii.  Count 2: Leaving the scene of an incident involving personal injury, in violation of Vehicle and Traffic Law § 600(2)(a), a class A misdemeanor;

> iii.  Count 3: Unsafe left turn/failure to signal, in violation of Vehicle and Traffic Law § 1163(a), a violation;

> iv.  Count 4: Covered or distorted license plate, in violation of Vehicle and Traffic Law § 402(1)(b), a violation;

> v.  Count 5: Equipment—inadequate brakes, steering, or horn, in violation of Vehicle and Traffic Law § 375(1)(a), a violation.

*See* Exhibit M.

209.  In the "To Wit" section, the Felony Complaint stated the false factual basis which Defendants had come up with to support the false charges. It also listed the 'sources' of this false information—Det. Lunt's investigation, D/Sgt. Russell's statements, the Supporting Deposition of Grady, the "witness," and the 7/11 surveillance video; the only video which clearly depicted the incident in the parking lot. *See id.*

210.  Defendants charged Hasper despite the fact that they knew there was no probable cause or reasonable suspicion to believe he committed these crimes and violations, and despite the fact that there existed substantial credible and uncontradicted evidence that he did not commit the charged crimes.

211.  While the Felony Complaint was prepared for Det. Lunt's signature, D/Sgt. Russell, Det. Vacchiano, Det. Roche, Det. Purcell, Det. Panuthos, D/Sgt. Hussain, and Lt. Troise all agreed upon its content and participated in preparing the false narrative, and thereby, knowingly participated in the filing of those false charges. Additionally, D/Sgt. Russell, Det. Vacchiano,

Det. Roche, Det. Purcell, Det. Panuthos, D/Sgt. Hussain, and Lt. Troise permitted these false charges to be filed despite the fact that they all knew the charges were fabricated, and despite the fact that any one of them could have spoken up and intervened, and prevented Hasper from being wrongfully arrested and charged for crimes they each knew he did not commit.

212.  Despite knowing that the contents of the "To Wit" clause in the Felony Complaint were materially false, Det. Lunt swore to the truth of the statements contained therein, under penalty of perjury.

213.  As to the other individually-named defendants, they all knew that the allegations and 'evidence' noted in the Felony Complaint were false, and that Hasper was being charged, and thereby prosecuted, unconstitutionally. Each individually-named defendant could have intervened thereby preventing Hasper from being charged and prosecuted unconstitutionally— they could have exposed the others' unconstitutional acts or, at the very least, advised the NCDA that the account was fabricated. They each failed to intervene, despite their ability to do so. They failed to do so because all individually-named defendants shared a common goal, and were jointly involved in a common scheme, to ensure that Hasper was falsely arrested and prosecuted.

214.  After Hasper was processed, Defendants all ensured that all the fabricated evidence was forwarded to the NCDA, including Grady's Supporting Deposition, the Police Accident Report, D/Sgt. Russell's medical records, all four traffic summonses, and the Felony Complaint, as well as additional notes they recorded of their 'investigation' such as Det. Lunt's DD Narrative, and various memo book pages where they recorded false information to support Hasper's unlawful prosecution. They did so knowing that these fabricated documents contained materially-false information which was necessary to support the prosecution against Hasper, and that without them, the NCDA would not have probable cause sufficient to continue prosecuting Hasper.

215.  Of course, the fabricated documents could not provide probable cause to prosecute. However, Defendants did not advise the NCDA that the documents were fabricated, and Hasper was prosecuted without probable cause to believe that a criminal prosecution, absent fabricated information, would be successful.

216.  Hasper was held in custody at the NCPD Third Precinct overnight, until he was transported the following day to NCPD headquarters.

## HASPER'S ARRAIGNMENT ON MONDAY, FEBRUARY 18, 2019

217.  Having Hasper prosecuted for crimes he did not commit, was not enough for Defendants. They ensured that he was mistreated as much as possible, to intentionally cause Hasper great mental and emotional anxiety.

218.  For example, while police personnel who are under arrest are segregated from the general population of arrestees to ensure their safety, Hasper was transported the following morning from NCPD Headquarters to the Nassau County First District Court to be arraigned, in a prisoner van with the general population. During the transport, one member of the NCPD, a middle-aged

white male whose identity Plaintiff does not yet know, intentionally disclosed to the general population of arrestees that Hasper was a police officer, despite the obvious inherent danger to Hasper which that disclosure created. This caused Hasper extreme emotional distress as he feared for his physical safety.

219. After arriving at the courthouse, for safety reasons, Hasper requested to be segregated from the other prisoners. However, another member of the NCPD whose identity Plaintiff does not yet know, told Hasper that because he "fucked with one of ours, you get no favors." This continued to cause Hasper great emotional distress, as he continued fearing for his safety.

220. After this officer transferred Hasper to the custody of the Nassau County Sheriff's Department, Hasper immediately requested to be segregated. That request was granted, as it is customary to segregate law enforcement personnel for safety concerns. However within five minutes, the Deputy Sheriff whom Hasper had spoken with reappeared, and apologized to Hasper, stating, in sum and substance, "I'm sorry, but apparently you pissed off the wrong people." He continued, stating to Hasper that the NCPD insisted that Hasper go into general population, and that the Sheriff's Department disclose the fact that Hasper is a former cop. The Deputy Sheriff also told Hasper, in sum and substance, 'I'm really sorry, but you should also know that the Nassau County PD controls the order of arraignments, and you're going to be called dead last.'

221. Hasper was then placed in a large open holding cell with approximately 30 other inmates, several of whom were gang members affiliated with MS-13 and the Latin Kings. Defendants knew, or should have known, that Hasper spent his career locking up gang members affiliated with those gangs. Defendants acted outrageously, intentionally, and maliciously, in order to cause Hasper additional stress, anxiety, and mental anguish.

222. True to their word, and despite the fact that Hasper had surrendered himself the prior evening to facilitate the booking and arraignment process, Defendants ensured that Hasper was the last arrestee to be arraignment that Monday in Nassau County First District Court.

223. Further reflecting their malice, Defendants requested that the NCDA seek substantial bail at Hasper's arraignment. The prosecutor, at Defendants' behest, vehemently argued that $50,000 bail be set, for a West Point graduate, disabled Combat Veteran, retired SCPD Lieutenant, who was a long-time resident of Long Island, with no prior criminal record, and incredibly strong community ties. Bail was set in the sum of five-thousand dollars cash over ten-thousand dollars bond ($5,000/$10,000), which Hasper's father posted later that day. As a result, Hasper's liberties were restrict, and he was immediately forced to surrender his firearms.

### DEFENDANTS' MEDIA BLITZ TO DESTROY HASPER'S REPUTATION

224. Further reflecting their malice, following Hasper's arraignment Defendants notified various news outlets of Hasper's arrest. However, Defendants intentionally refused to release the exculpatory 7/11 video to the media, which would have cleared Hasper of the charged crimes and violations. Critically, as noted, the 7/11 video proves that Hasper did not intentionally strike

D/Sgt. Russell with his truck on multiple occasions as alleged, and that D/Sgt. Russell was not injured. Rather, Defendants only released the NCPD paperwork containing their fabricated account of the incident.

225. By February 21, 2019, virtually every major news outlet in the Tristate region published Defendants' fabricated account of the incident in the BFCU parking lot. Those news outlets include, but are not limited to, NBC, ABC, CBS, and News 12 Long Island. In fact, News 12 Long Island ran a two-minute and twenty-nine-second "exclusive" story on a 15-minute loop, for 48 hours straight. Defendants' false account of Hasper's actions was also published in newspapers, and talked about over the radio. In addition, News 12 also reported the story from the front steps of Hasper's home, humiliating him in front of his neighbors even more. Defendants' account of the incident was also published online. The following are just some, but not all, of the links to the online articles: https://www.nbcnewyork.com/news/local/retired-suffolk-lieutenant-accused-of-hit-and-run-involving-nassau-cop/41774/; https://abc7ny.com/hit-and-run-suffolk-county-police-lieutenant-william-hasper-nassau/5150252/; https://wcbs880.radio.com/articles/retired-long-island-lt-william-hasper-accused-hitting-nassau-sergeant-car; http://longisland.news12.com/story/40003071/police-retired-suffolk-lieutenant-hit-nassau-officer-with-car-fled; https://www.facebook.com/EileenLehpamer12/posts/exclusive-retired-suffolk-police-lt-william-hasper-arrested-and-charged-with-ass/1566685110141710/; https://www.newsday.com/long-island/suffolk/william-hasper-suffolk-police-1.18486704; https://patch.com/new-york/eastmeadow/retired-suffolk-officer-hit-nassau-officer-his-car-report Of course, these internet links will remain in place indefinitely, continuing to cause Hasper great harm.

226. These false allegations against Hasper and his arrest reached hundreds of thousands, if not millions, of homes in the Tristate area.

227. These false allegations were also circulated in Facebook communities which Hasper was proudly associated with. For example, Hasper's mugshot, along with an article published on Patch.com titled "Retired Suffolk Officer Hit Nassau Officer With His Car: Report," was posted to the Facebook group Suffolk County Police Department Friends. Hasper became the target of nasty and vile comments and ridicule, such as "Check his car for Gilgo DNA," which referred to the Gilgo Beach killings discovered in 2010. The story also circulated on Hasper's high school Facebook page, which resulted in Defendants' false story being dissemination nationwide.

228. Unfortunately, wherever Hasper went locally—the Deer Park Fire House, Knights of Columbus, American Legion, VFW (Veterans of Foreign Wars), Lions Club, and so forth—the majority of the membership was aware of Defendants' false story, which publicly humiliated Hasper even more.

## HASPER'S UNLAWFUL DETAINMENT AND THE UNLAWFUL SEIZURE OF HIS VEHICLE DUE TO THE FABRICATED ALARM

229. Despite Mr. Sapone's invitation for Det. Lunt to obtain a warrant in order to seize Hasper's truck, Defendants did not apply for one—presumably because they knew they did not

have probable cause to support a warrant application. However, because Hasper's defense attorneys refused to consent to the surrender of the truck, Defendants intentionally did not withdraw the false alarm they had issued on February 15, 2019, as they hoped the false alarm would allow them to circumvent the warrant requirement and thereby seize the truck.

230.  22 days later, at approximately 6:35 PM on Saturday, March 9, 2019, Hasper was lawfully and peacefully operating his pickup truck at the intersection of Carlls Path and Long Island Avenue, in Deer Park, Suffolk County, New York.

231.  At that time, SCPD PO Keith G. Picconi, Shield # 6535, and PO John N. Caraccia, Shield # 6833, were driving RMP Unit 102. Based upon the false alarm which stated that the truck was stolen, that it should be held for evidence, and that the operator was wanted by the police, and was armed and/or dangerous, the SCPD Police Officers stopped Hasper at gun point, at the intersection of Carlls Path and Long Island Avenue. They were accompanied by SCPD PO Anton E. Fanelli, Shield #6842, and PO Christopher Alberto, Shield #6627, who were driving RMP Unit 105, and SCPD PO Robert Mroczkowski, who was driving RMP Unit 103.

232.  PO Picconi immediately positioned himself 10 feet from Hasper's driver's side window, in a bladed stance, and with his gun pointed at Hasper's head, repeatedly screaming the following orders: "Police. Don't move!" and "Show me your hands!"

233.  Hasper followed PO Picconi's commands, as PO Picconi steadily advanced toward Hasper with his gun still aimed at Hasper's head. As PO Picconi approached, Hasper identified himself, and stated words to the effect of "calm down, I am a retired Suffolk County Lieutenant out of the First Precinct. I am unarmed, and I will fully comply."

234.  PO Picconi continued screaming at Hasper, and then repeatedly yelled "Who reported the vehicle stolen?!"

235.  Still holding Hasper at gunpoint, PO Picconi ordered him to get out of the truck and onto the ground, and threated to shoot Hasper if he did not comply. Hasper complied. As he lay prone on the ground, he was handcuffed. Thereafter, he was patted down, and then held against his will, while handcuffed, for over one hour, in the backseat of PO Picconi's patrol car.

236.  In addition to the units that had been at the scene initially as noted, PO Picconi called for backup and a patrol supervisor. Ultimately, approximately 15 units responded to the scene, including the following supervisors: Squad Lieutenant Joseph M. Zurl, RMP Unit 141, Patrol Sergeant Michael Mortilla, RMP Unit 136, and Patrol Sergeant Eric R. Guiterman, RMP Unit 135.

237.  This heavy response, and Hasper being held and threatened at gunpoint, was not only foreseeable by Defendants when they issued the false alarm and then intentionally failed to withdraw it, but, based upon the nature of the alarm, it was also an intended result thereof.

238.  While in the backseat of the squad car, Hasper explained who he was, that he was the registered owner of the truck, and that it had never been stolen or reported stolen. The SCPD

personnel were quickly able to corroborate Hasper's claims through the Department of Motor Vehicles, and the documents within Hasper's truck.

239. Hasper asked what this was all about. In response, PO Picconi advised Hasper that his plate reader hit which resulted in the stop, and that thereafter, an alert was broadcast over the precinct radio which resulted in the massive police response. PO Picconi showed Hasper the alarm issued by NCPD on the computer screen inside his RMP, as well as a photograph of his license plate.

240. SCPD supervisors who arrived at the scene spoke to PO Picconi. Thereafter, PO Picconi told Hasper that his supervisors would contact their counterparts at the NCPD Third Squad, which was the source of the alarm.

241. SCPD Sgt. Mortilla contacted D/Sgt. Hussain at the Third Squad. D/Sgt, Hussain of course knew that Hasper's truck was not stolen, and was fully aware that the alarm was fabricated, and that Hasper had already surrendered and was already arraigned. Despite that, D/Sgt. Hussain directed SCPD Sgt. Mortilla to detain Hasper and his truck.

242. Thereafter, SCPD supervisors told Hasper that they had contacted the NCPD Third Squad, and that the NCPD was coming to seize his vehicle. Hasper was advised that according to NCPD directives, he could not enter his vehicle to retrieve any property located therein.

243. Hasper asked to see a warrant, or some other lawful judicial Order authorizing the seizure of his vehicle, but he was ignored.

244. Subsequently, a NCPD Emergency Service Unit vehicle arrived, and an officer whose identity is not yet known to Plaintiff exited that vehicle, got in Hasper's truck, and drove it away. In addition to the unlawful seizure of the truck, the NCPD officer violated proper rules and procedure by not conducting a vehicle inventory at the scene, and by not having the truck towed away on a flatbed or tow truck. He did so based upon Defendants' directives, and without consent, without a warrant, and without the existence of any exception to the warrant requirement, in blatant violation of Hasper's clearly-established constitutional rights. The seizure was also done in blatant violation of the NCPD's impound rules and procedures, and for obvious reasons, eviscerated the alleged evidentiary value, and the claimed reason it was seized for in the first instance.

245. In short, Hasper was stopped, seized, searched, and held against his will while handcuffed for over one hour. Additionally, his property was seized and searched, without his consent or judicial approval.

246. Defendants unlawfully retained possession of Hasper's truck, and searched it thoroughly. Despite Hasper's defense attorney's repeated demands for its return, and for an explanation as to their legal basis for seizing and searching it, Defendants did not return it for 10 days, and never provided explained their claimed legal basis for seizing or searching it. While Defendants did finally return the truck 10 days later, to date they did not return numerous personal items which Hasper had kept in it.

247.  Despite Hasper being unlawfully stopped, at gunpoint, on March 9, 2019, and despite the fact that Defendants had unlawfully seized Hasper's vehicle, they nonetheless failed to terminate the false alarm. They did not do so intentionally, so as to continue to harass Hasper and violate his rights, in further relationship for 'messing with one of their own.'

248.  As a result, on Monday, May 6, 2019, 80 days after the false alarm was issued, Hasper was once again stopped due to the false alarm.

249.  Hasper was driving NCPD Lt. Carmine Soldano, who has Nasal Pharyngeal Cancer related to 9/11/2001, and his wife Susan, for his follow-up appointment at Lenox Hill Hospital in Manhattan, following Lt. Soldano's cancer surgery. HASPER routinely drove the Soldano's to Lenox Hill Hospital, to assist his ill friend and provide them with moral support.

250.  At approximately 1:55 PM, Hasper was driving southbound on the Cross Island Parkway, approximately two miles north of Northern Boulevard, in Bayside, Queens, when he was stopped by New York State Trooper M. Guadalupe, Bronx Barracks, Shield #1244, who was driving Unit 3M61. Lt. Soldano was in the front passenger seat, and his wife Susan was in the rear passenger seat.

251.  Trooper Guadalupe cautiously approached the truck, with his hand on his gun, and asked "Are you William Hasper? Did you have a problem in Nassau County?" After extremely tense introductions, Hasper produced his license and registration, upon request. Trooper Guadalupe told Hasper that he could not leave the scene, and that the alarm issued by the NCPD directed that the truck be seized for evidence.

252.  Trooper Guadalupe advised Hasper that he was being detained due to an alarm out of the NCPD Third Squad. After approximately 45 minutes, Trooper Guadalupe advised Hasper that he was free to leave. He told Hasper that if not for his buddy, Lt. Soldano, being in the car with him, he would have arrested Hasper.

253.  Defendants only cancelled the false alarm after Hasper was stopped and detained for the second time on May 6, 2019. *See* Exhibit N.

254.  While Defendants did not personally seize or detain Hasper on March 9 and May 6, 2019, Hasper was unlawfully seized and searched, and his property was confiscated, as a direct result of Defendants' actions. They knowingly fabricated the alarm with the specific goal of achieving this unconstitutional consequence, and their conduct directly resulted in the violation of Hasper's rights.

## HASPER'S INDICTMENT AND SUBSEQUENT TRIAL

255.  Following Hasper's arrest, the case was assigned to ADA Christopher Mango, and Defendants ensured that all the fabricated documents and evidence referenced above, were forwarded to Mr. Mango for his use during Hasper's prosecution.

256. Mr. Mango reviewed the documents not knowing that they were in fact fabricated. Given that the fabricated documents, particularly Grady's unbiased account of the incident as reflected in his Supporting Deposition, corroborated D/Sgt. Russell's version of the events and 'proved' that Hasper intentionally struck D/Sgt. Russell, the decision was made for Mr. Mango to present the case before a grand jury.

257. D/Sgt. Russell testified before the grand jury on April 30, 2019, and lied about the material facts which occurred on February 15, 2019 at the BFCU. While Mr. Mango played portions of the 7/11 video before the grand jury, the video had no audio, and therefore, D/Sgt. Russell was asked to fill in the blanks as to what was said. As the 7/11 video was played before the grand jury, D/Sgt. Russell lied about what both he and Hasper had said at the time, consistent with Defendants' fabricated account of the incident, and directly contrary to the true facts. He testified that Hasper was screaming, waiving with his hands, and shouting vulgar statements at him, that he identified himself to Hasper as an on-duty Sergeant with the NCPD and told Hasper he was not free to leave, that Hasper ignored his orders and intentionally struck him as Hasper fled the parking lot, which caused D/Sgt. Russell to sustain a physical injury.

258. On May 2, 2019, D/Sgt. Russell was recalled to the grand jury due to technical difficulties with the video evidence on April 30, 2019. Once again, portions of the 7/11 video were played, and D/Sgt. Russell was asked to describe what was being said and done at each segment. D/Sgt. Russell continued lying before the grand jury as to what both he and Hasper had said and done, consistent with Defendants' fabricated account of the incident, and directly contrary to the true facts.

259. On May 2, 2019, Det. Lunt also testified before the grand jury. However, Det. Lunt was not asked about the 'investigation' into the incident, but only about Hasper's arrest at the Third Precinct on February 17, 2019.

260. Upon information and belief, no other witness was called to testify before the grand jury—including Grady, whose account of the incident would have demonstrated that Hasper did not commit any crime.

261. In addition to the two crimes and three violations which Defendants had charged Hasper with, based upon the fabricated documents which Defendants created and forwarded to the NCDA, Mr. Mango presented additional charges to the grand jury for its consideration; (1) Assault in the Third Degree; Causing injury to another with the intent to do so, in violation of Penal Law § 120.00(1), a class A misdemeanor, and (2) Reckless Endangerment in the Second Degree; Recklessly engages in conduct which created a substantial risk of serious physical injury to another, in violation of Penal Law §120.20, a class A misdemeanor.

262. While these two charges were not personally filed by Defendants, but were added by the NCDA, the NCDA only did so based upon the fabricated evidence which Defendants submitted, including Grady's Supporting Deposition, the Police Accident Report, D/Sgt. Russell's medical records, all four traffic summonses, the Felony Complaint, the PDCN 206 Packet, D/Sgt. Russell's statement dated April 17, 2019, as well as additional notes Defendants recorded of their

'investigation' such as Det. Lunt's DD Narrative, and various memo book pages where they recorded false information to support Hasper's unlawful prosecution.

263.  On May 9, 2019, Hasper was indicted on the following crimes and violations, under Indictment No. 778N-19:

> i.  Count 1: Assault in the Second Degree; Causing physical injury to a police officer while acting with the intent to prevent a police officer from performing a lawful duty, in violation of Penal Law § 120.05(3), a class D violent felony;

> ii.  Count 2: Assault in the Third Degree; Causing injury to another with the intent to do so, in violation of Penal Law § 120.00(1), a class A misdemeanor;

> iii.  Count 3: Reckless Endangerment in the Second Degree; Recklessly engages in conduct which created a substantial risk of serious physical injury to another, in violation of Penal Law §120.20, a class A misdemeanor;

> iv.  Count 4: Leaving the scene of an incident involving personal injury, in violation of Vehicle and Traffic Law § 600(2)(a), a class A misdemeanor;

> v.  Count 5: Unsafe left turn/failure to signal, in violation of Vehicle and Traffic Law § 1163(a), a violation;

> vi.  Count 6: Covered or distorted license plate, in violation of Vehicle and Traffic Law § 402(1)(b), a violation;

> vii.  Count 7: Equipment—inadequate brakes, steering, or horn, in violation of Vehicle and Traffic Law § 375(1)(a), a violation.

*See* Exhibit O.

264.  However, given the fabricated documents and information which was submitted to the NCDA prior to the grand jury presentation, and the fabricated information testified to during the presentation itself, Hasper's indictment was achieved through misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, and the failure to make a full and complete statement of facts to the grand jurors.

265.  Hasper was arraigned on the Indictment on May 20, 2019, in AP1, before the Honorable Meryl J. Berkowitz.

266.  One of the roles of the AP1 Judge is to assess cases, and dispose of those which are legally insufficient, weak, ripe for disposition, and so forth. Additionally, Judge Berkowitz would routinely make notes on files containing her assessment of a case, prior to the case being sent to another judge. After reviewing the 7/11 video and the paperwork related to Hasper's case, Judge Berkowitz wrote a note on Hasper's file, which stated, in sum and substance, that 'this

case is entirely nonsense.' She orally communicated her thoughts on the case to both Hasper's counsel, and ADA Mango.

267.  At arraignment, Judge Berkowitz released Hasper on his own recognizance.

268.  Following arraignment, Hasper's case was assigned to the Honorable Christopher G. Quinn.

269.  Discovery was exchanged, and the matter was certified trial-ready on January 3, 2020.

270.  In addition to Hasper's arraignments on February 18 and May 20, 2019, he was compelled to make numerous court appearances to defend against the false charges, including February 28, 2019, June 20, 2019, July 29, 2019, August 21, 2019, September 25, 2019, November 13, 2019, November 14, 2019, December 3, 2019, January 3, 2020, January 31, 2020, February 3, 2020, February 4, 2020, and February 5, 2020. Being required to appear in court to this extent further deprived Hasper of his liberty.

271.  The case against Hasper was tried without a jury. It began on January 31, 2020, and continued on February 3, 4, and 5, 2020.

272.  The prosecution called three witnesses—D/Sgt. Russell, Det. Lunt, and Dr. George Akerman, D/Sgt. Russell's personal physician. D/Sgt. Russell and Det. Lunt testified falsely concerning the events of February 15, 2019, consistent with the fabricated account of the incident they had agreed upon almost one year prior. Dr. Ackerman testified as to D/Sgt. Russell's claimed injury based upon D/Sgt. Russell's subjective statements thereto, and the medical records and x-rays.

273.  The defense called Baez, Grady, Warner Frey, a police practices expert, Dr. John Reilly, M.D., a medical expert, Connor McCourt, a video expert, and several character witnesses.

274.  On February 5, 2020, Judge Quinn rendered the following verdict:

    i.    Count 1: PL § 120.05(3), a class D violent felony; Not Guilty

    ii.    Count 2: PL § 120.00(1), a class A misdemeanor; Not Guilty

    iii.    Count 3: PL §120.20, a class A misdemeanor; Guilty

    iv.    Count 4: VTL § 600(2)(a), a class A misdemeanor; Not Guilty

    v.    Count 5: VTL § 1163(a), a violation; Guilty

    vi.    Count 6: VTL § 402(1)(b), a violation; Guilty

    vii.    Count 7: VTL § 375(1)(a), a violation; Guilty

275.  Hasper received a favorable termination as to Counts 1, 2, and 4—all crimes for which a "physical injury" was a necessary element—and those charges were all dismissed.

276.  While Hasper did not yet receive a favorable termination as to Count 3, alleging reckless endangerment, and Counts 5, 6, and 7, the violations, Hasper intends on appealing his conviction as to those Counts, to the Appellate Division, Second Department. Plaintiff is placing Defendants on notice that should Hasper obtain a favorable termination as to Counts 3, 5, 6, and/or 7, at any time, then he will seek leave to amend his Complaint to assert those causes of action for which a favorable termination is either a necessary element, or for which the lack of a favorable termination precludes pursuing causes of action seeking monetary damages.

277.  Hasper's next court appearance is currently scheduled for June 1, 2020, at which time it is anticipated that he will be sentenced as to Counts 3, 5, 6, and 7.

278.  At all times relevant herein, Defendants acted maliciously and/or wantonly in reckless disregard of Hasper's rights.

279.  Due to Defendants' actions, Hasper's liberty was restricted. He suffered, and continues to suffer, garden-variety emotional distress, including extreme humiliation, anxiety, stress, and difficulty sleeping. His personal and professional reputation was permanently damaged. And he lost employment opportunities and earnings, including, but not limited to, employment opportunities in the security and financial industries.

280.  Additionally, Hasper incurred substantial monetary damages in order to defend himself against the false charges. Given that the criminal proceedings are still pending, the full extent of those damages are not yet known. However, to date Hasper incurred in legal costs and fees in excess of two-hundred thirty-five-thousand dollars ($235,000.00).

## CAUSES OF ACTION

281.  Plaintiff acknowledges that given his conviction as to Counts 3, 5, 6, and 7, he cannot, at *this* time, maintain false arrest or false imprisonment claims due to his arrest on February 17, 2019, under 42 U.S.C. § 1983, or under New York State law. However, Plaintiff is placing Defendants on notice that should those convictions be vacated, at *any* time, that he will seek leave to amend his Complaint to assert those four claims.

## ONE
### 42 U.S.C. § 1983 – Malicious Prosecution (4th Amendment)

282.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-281 as though fully set forth herein.

283.  Defendants initiated, and continued, criminal proceedings against Hasper, and did so without probable cause.

284. Specifically, D/Sgt. Russell completed three traffic summonses, and Det. Lunt completed a fourth traffic summons and executed the Felony Complaint.

285. As to the other individually-named defendants, they likewise initiated and continued criminal proceedings against Hasper in a number of ways. They all played an active role in the prosecution by knowingly participating in creating the false account of the incident which they attributed to D/Sgt. Russell, knowingly participating with Det. Lunt in generating false witness statements—Grady's and D/Sgt. Russell's, knowingly participating in creating the factually-false narrative contained in the Felony Complaint, and knowingly participating in creating the other false documents referenced above in order to support, and not to contradict, their agreed-upon false account of the incident.

286. Additionally, Defendants all initiated and continued the criminal proceedings because they were aware that Hasper's constitutional rights, including his right to be free from malicious prosecution, were being violated by law enforcement officials, they each had an opportunity to intervene to prevent the harm from occurring, and once it occurred, from continuing, however they all failed to do so.

287. Furthermore, Defendants all initiated and continued the criminal proceedings because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper was detained and prosecuted based upon false charges.

288. Defendants also initiated criminal proceedings as to the two charges which were subsequently added by the NCDA, given that the NCDA only added those charges based upon the fabricated information Defendants all submitted to it. Therefore, Defendants were instrumental in brining about those charges.

289. Defendants acted maliciously, and for a purpose other than to bring Hasper to justice.

290. Hasper was arrested, arraigned, forced to set bail, indicted, arraigned a second time, made to appear in court numerous times, and ultimately tried, therefore he suffered a sufficient post-arraignment liberty restraint.

291. Although Hasper was indicted by a grand jury, the indictment was procured by misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, withholding of exculpatory evidence, and the failure to make a full and complete statement of facts to the grand jurors.

292. On February 5, 2019, the criminal proceedings terminated in Hasper's favor as to Counts 1, 2, and 4, alleging crimes in violation of Penal Law §§ 120.05(3), 120.00(1), and VTL § 600(2)(a), when Judge Quinn found Hasper not guilty of those charges, and dismissed them.

293. Defendants therefore maliciously prosecuted Hasper, in violation of the Fourth Amendment to the United States Constitution.

**TWO**
**42 U.S.C. § 1983 – Due Process Fabricating/Falsifying Evidence (14th Amendment)**

294.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-293 as though fully set forth herein.

295.  Defendants fabricated evidence against Hasper prior to the start of Hasper's criminal proceedings, while they were 'investigating' the case, and continued fabricating evidence while Hasper's criminal proceedings were pending.

296.  Defendants fabricated evidence by affirmatively creating false documents and information, by withholding exculpatory evidence from the NCDA, and by knowingly making false statements and omissions which were material to the proceedings, as discussed above in detail.

297.  While each individually-named defendant may not have physically drafted a document which was fabricated, each defendant is nonetheless liable for the fabrication of all the evidence submitted to, or improperly withheld from, the NCDA. They all knowingly participated in creating the false account of the incident which they attributed to D/Sgt. Russell, and they all knowingly participated in ensuring that the evidence was fabricated in a manner which would support, and would not contradict, their agreed-upon false account of the incident.

298.  Additionally, Defendants are all liable for the fabrication of all the evidence submitted to, or improperly withheld from, the NCDA, given that they were all aware that Hasper's constitutional rights, including his right not to be deprived of his liberty based upon fabricated evidence, were being violated by law enforcement officials, they each had an opportunity to intervene to prevent the harm from occurring, and once it occurred, from continuing, however they all failed to do so.

299.  Furthermore, Defendants are all liable for the fabrication of all the evidence submitted to, or improperly withheld from, the NCDA, because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper was detained and prosecuted, and that his liberty was infringed upon, based upon fabricated evidence.

300.  The fabricated evidence, oral statements, and omissions, were materially significant to the extent that they were all likely to influence a jury, or other fact-finder, in its determination.

301.  The fabricated evidence and oral statements were all forwarded to, and the material omissions were withheld from, the NCDA.

302.  The fabricated evidence directly and proximately caused Hasper to be criminally charged, indicted, made to appear in court numerous times, and ultimately tried. Therefore, each of the above-referenced fabricated acts were part of the chain of causation which deprived Hasper of his liberty.

303. Defendants therefore fabricated evidence against Hasper and deprived him of his right to a fair trial, in violation of the Fourteenth Amendment to the United States Constitution.


### THREE
### 42 U.S.C. § 1983 – Unlawful Search of Hasper's home on February 15, 2019
### (4th Amendment)

304. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-303 as though fully set forth herein.

305. Hasper had a reasonable expectation of privacy in his home address on February 15, 2019.

306. Det. Roche, John Doe No. 1 (who may be one of the other individually-named defendants), and John Doe No. 2, entered Hasper's home and remained in it without a warrant, without satisfying any exception to the warrant requirement, and absent any other legal basis to do so.

307. Additionally, neither Hasper nor Ms. Todoran, the only two individuals who resided at that address, consented to Det. Roche, John Doe No. 1, or John Doe No. 2, entering or remaining in their home. In fact, Hasper, his attorney Mr. Davis, and Ms. Todoran, demanded that these defendants leave, multiple times, however they refused to do so.

308. Defendants Det. Roche, John Doe No. 1, or John Doe No. 2, therefore unlawfully searched Hasper's home, in violation of the Fourth Amendment to the United States Constitution.


### FOUR
### 42 U.S.C. § 1983 – Unlawful Seizure and False Imprisonment on March 9, 2019
### (4TH Amendment)

309. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-308 as though fully set forth herein.

310. Defendants issued the false vehicle alarm despite knowing that the content published therein was blatantly false—particularly the false claim that Hasper's truck was stolen and that he was 'wanted.' Additionally, Defendants knew they had no lawful basis to do so, as they had no consent, no warrant, and no exception to the warrant requirement, to have Hasper and/or his truck seized and/or searched.

311. However, Defendants acted unlawfully in order to circumvent legal process and the warrant requirement, and acted with the specific goal of having Hasper's constitutional rights, particularly his right to be free from unreasonable searches and seizures, violated.

312.  Based upon their actions, directly and proximately, on March 9, 2019, Hasper was stopped at gunpoint, and then held in a patrol car for over one hour, at the intersection of Carlls Path and Long Island Avenue, in Deer Park, New York.

313.  Defendants intended to have Hasper confined, and based upon their knowingly-unlawful actions, Hasper was intentionally confined.

314.  Hasper did not consent to the confinement, he was confined against his will, and he was conscious of the confinement.

315.  Additionally, Hasper was unlawfully confined because there was no probable cause or reasonable suspicion to believe he committed a crime, and his confinement was without privilege or justification.

316.  While Defendants did not physically confine Hasper, they are nonetheless liable for his unlawful seizure and false imprisonment because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper was unlawfully stopped, seized, and detained, based upon the false alarm they knowingly issued. Defendants acted specifically to accomplish this goal, knowing that law enforcement officers who came upon Hasper would react in the manner that the SCPD did.

317.  Additionally, Defendants are liable for Hasper's unlawful seizure and false imprisonment because they were all aware that Hasper's constitutional rights, including his right to be free from unreasonable searches and seizures, were being violated by law enforcement officials, they each had an opportunity to intervene to prevent the harm from occurring, however they all failed to do so. Indeed, Defendants all had from February 15, 2019, the day the false alarm was issued, until March 9, 2019, when Hasper was unlawfully stopped the first time, to have the false alarm withdrawn. However, they intentionally failed to do so, despite all knowing that Hasper had already been arraigned (and therefore, was certainly not 'wanted').

318.  Defendants therefore caused Hasper to be unlawfully seized, and falsely imprisoned, in violation of the Fourth Amendment to the United States Constitution.


## FIVE
## 42 U.S.C. § 1983 – Unlawful Seizure and Search of Hasper's truck (4TH Amendment)

319.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-318 as though fully set forth herein.

320.  Defendants issued the false vehicle alarm despite knowing that the content published therein was blatantly false—particularly the false claim that Hasper's truck was stolen. Additionally, Defendants knew they had no lawful basis to do so, as they had no consent, no warrant, and no exception to the warrant requirement, to have Hasper and/or his truck seized and/or searched.

321.  However, Defendants acted unlawfully in order to circumvent legal process and the warrant requirement, and acted with the specific goal of having Hasper's constitutional rights, particularly his right to be free from unreasonable searches and seizures, violated.

322.  Based upon their actions, directly and proximately, on March 9, 2019, Hasper was stopped at gunpoint while driving his truck, at the intersection of Carlls Path and Long Island Avenue, in Deer Park, New York.

323.  Despite knowing that Hasper's truck was not stolen, that Defendants did not have a warrant permitting them to seize and/or search it, and that they had no probable cause to do so either, D/Sgt. Hussain advised SCPD Sgt. Mortilla at the scene to detain Hasper's truck, and not to allow Hasper to recover his possessions from it. D/Sgt. Hussain then directed a uniformed Police Officer to respond to the scene, seize Hasper's truck, and drive off with it. Thereafter, Defendants unlawfully maintained possession of it for 10 days, and searched it in its entirety.

324.  Hasper had a reasonable expectation of privacy in his truck.

325.  Defendants did not have a warrant to seize or search Hasper's truck at any point in time from when they issued the false alarm on February 15, 2019, through March 9, 2019 when they seized and searched it, or over the next 10 days when they maintained possession of it and searched it. Defendants did not satisfy any exception to the warrant requirement, and they had no other legal basis, to do so.

326.  Defendants' unlawful seizure and search of Hasper's truck constitutes a meaningful interference with Hasper's possessory interest in his property.

327.  Hasper did not consent to the seizure or search of his truck, or to Defendants retaining possession of it for 10 days. In fact, through his criminal defense attorneys Hasper repeatedly demanded that his truck be returned, and he demanded an explanation as to Defendants' claimed legal basis for seizing, searching, and retaining possession of it.

328.  While Defendants did not initially physically seize Hasper's truck on March 9, they are nonetheless liable for its unlawful seizure and search, because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper's property was unlawfully seized and searched, based upon the false alarm they knowingly issued. Defendants acted specifically to accomplish this goal, knowing that law enforcement officers who came upon Hasper and his truck would react in the manner that the SCPD did.

329.  Additionally, Defendant are liable for the unlawful seizure and search of Hasper's property because they were all aware that Hasper's constitutional rights, including his right his right to be free from unreasonable searches and seizures, were being violated by law enforcement officials, they each had an opportunity to intervene to prevent the harm from occurring, however they all failed to do so. Indeed, Defendants all had from February 15, 2019, the day the false alarm was issued, until March 9, 2019, when Hasper's truck was unlawfully stopped the first time, to have the false alarm withdrawn, however they intentionally failed to do

so. Thereafter, they had 10 days to prevent the continued violation of his rights, yet failed to do so as well.

330.  Defendants therefore caused Hasper's truck to be unlawfully seized, and they then unlawfully searched and retained possession of it, in violation of the Fourth Amendment to the United States Constitution.

## SIX
## 42 U.S.C. § 1983 – Supervisory Liability as to D/Sgt. Hussain

331.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-330 as though fully set forth herein.

332.  The uniformed Police Officer who entered and drove off in Hasper's truck on March 9, 2019 violated Hasper's constitutional rights to be free from unreasonable searches and seizure, as did the NCPD personnel who retained, and searched, Hasper's truck for the next 10 days.

333.  D/Sgt. Hussain directed the uniformed Police Officer, and the other NCPD personnel referenced above, to take the actions at issue.

334.  D/Sgt. Hussain had knowledge of the actions of the uniformed Police Officer, and the other NCPD personnel referenced above, which violated Hasper's right to be free from unreasonable searches and seizure. However, D/Sgt. Hussain acquiesced in the violations, and was deliberately indifferent to Hasper's clearly established constitutional rights.

335.  D/Sgt. Hussain is therefore liable for the actions of the uniformed Police Officer, and the other NCPD personnel referenced above, which violated Hasper's constitutional rights.

## SEVEN
## 42 U.S.C. § 1983 – Unlawful Seizure and False Imprisonment on May 6, 2019
## (4TH Amendment)

336.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-335 as though fully set forth herein.

337.  Defendants issued the false vehicle alarm despite knowing that the content published therein was blatantly false—particularly the false claim that Hasper's truck was stolen and that he was 'wanted.' Additionally, Defendants knew they had no lawful basis to do so, as they had no consent, no warrant, and no exception to the warrant requirement, to have Hasper and/or his truck seized and/or searched.

338.  Based upon their actions, directly and proximately, on May 6, 2019, Hasper was stopped, and was not free to leave for approximately 45 minutes, while he was driving southbound on the Cross Island Parkway, approximately two miles north of Northern Boulevard.

339.  Defendants intended to have Hasper confined, and based upon their knowingly-unlawful actions, Hasper was intentionally confined.

340.  Hasper did not consent to the confinement, he was confined against his will, and he was conscious of the confinement.

341.  Additionally, Hasper was unlawfully confined because there was no probable cause or reasonable suspicion to believe he committed a crime, and his confinement was without privilege or justification.

342.  While Defendants did not physically confine Hasper, they are nonetheless liable for his unlawful seizure and false imprisonment because they all shared a common goal, and were all jointly involved in a common scheme, to ensure that Hasper was unlawfully stopped, seized, and detained, based upon the false alarm they knowingly issued. Defendants acted specifically to accomplish this goal, knowing that law enforcement officers who came upon Hasper would react in the manner that Trooper Guadalupe did.

343.  Additionally, Defendants are liable for Hasper's unlawful seizure and false imprisonment because they were all aware that Hasper's constitutional rights, including his right to be free from unreasonable searches and seizures, were being violated by law enforcement officials, they each had an opportunity to intervene to prevent the harm from occurring, however they all failed to do so. Indeed, Defendants all had from February 15, 2019, the day the false alarm was issued, until May 6, 2019, when Hasper was unlawfully stopped the second time, to have the false alarm withdrawn. However, they intentionally failed to do so, even after they all knew that Hasper was unconstitutionally seized and detained two months prior.

344.  Defendants therefore caused Hasper to be unlawfully seized, and falsely imprisoned, in violation of the Fourth Amendment to the United States Constitution.


## EIGHT
### 42 U.S.C. § 1983 – Due Process Violations due to the continued harassment
### (14th Amendment)

345.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-344 as though fully set forth herein.

346.  Defendants intentionally harassed Hasper over the course of several months, with the specific intent to cause him to suffer severe emotional distress and/or with the reckless disregard of the emotional distress their conduct would cause to Hasper.

347.  For example, they refused to place him, and allow him to be placed, in protective custody while he was transported from NCPD Headquarters and then held for arraignment. Rather, they ensured that he was placed with the general population of prisoners, and that it was disclosed to all that he was former police. Defendants also issued the false car alarm with the specific goal of having Hasper, and his truck, illegally seized and searched. After Hasper's rights were violated

in this respect on March 9, 2019, Defendants nonetheless refused to withdraw the false alarm, and therefore Hasper was illegally seized a second time due to this false alarm on May 6, 2019. Defendants also widely disseminated their fabricated account of the incident, to further cause Hasper to suffer emotional distress.

348. Defendants' continued harassment was severe, pervasive, and objectively offensive.

349. Defendants' continued harassment was extreme and outrageous, and went far beyond the bounds of decency tolerated by a civilized society.

350. Defendants caused Hasper to fear for his safety, and caused him to suffer emotional distress.

351. Defendants therefore harassed and intimidated Hasper to the extent that they deprived him of his due process, of the Fourteenth Amendment to the United States Constitution.

## NINE
## Pendent State Claim – Malicious Prosecution

352. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-352 as though fully set forth herein.

353. Defendants initiated, and continued, criminal proceedings against Hasper, and did so without probable cause.

354. Defendants acted maliciously, and for a purpose other than to bring Hasper to justice.

355. Hasper was arrested, arraigned, indicted, arraigned a second time, and tried, based upon the false charges Defendants filed against him, therefore he was seized and his personal liberty and privacy was infringed upon.

356. Although Hasper was indicted by a grand jury, the indictment was procured by misconduct undertaken in bad faith, fraud, perjury, misrepresentation and falsification of evidence, withholding of exculpatory evidence, and the failure to make a full and complete statement of facts to the grand jurors.

357. On February 5, 2019, the criminal proceedings terminated in Hasper's favor as to Counts 1, 2, and 4, alleging crimes in violation of Penal Law §§ 120.05(3), 120.00(1), and VTL § 600(2)(a), when Judge Quinn found Hasper not guilty of those charges, and dismissed them.

358. Defendants therefore maliciously prosecuted Hasper, in violation of the New York State Constitution and laws.

## TEN
## Pendant State Claim – Fabricating/Falsifying Evidence

359.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-358 as though fully set forth herein.

360.  Defendants fabricated evidence against Hasper prior to the start of Hasper's criminal proceedings, while they were 'investigating' the case, and continued fabricating evidence while Hasper's criminal proceedings were pending.

361.  Defendants fabricated evidence by affirmatively creating false documents and information, by withholding exculpatory evidence from the NCDA, and by knowingly making false statements and omissions which were material to the proceedings.

362.  The fabricated evidence, oral statements, and omissions, were materially significant to the extent that they were all likely to influence a jury, or other fact-finder, in its determination.

363.  The fabricated evidence and oral statements were all forwarded to, and the material omissions were withheld from, the NCDA.

364.  The fabricated evidence directly and proximately caused Hasper to be criminally charged, indicted, made to appear in court numerous times, and ultimately tried. Therefore, each of the above-referenced fabricated acts were part of the chain of causation which deprived Hasper of his liberty.

365.  Defendants therefore fabricated evidence against Hasper and deprived him of his right to a fair trial, in violation of the New York State Constitution and laws.


## ELEVEN
## Pendant State Claim – Unlawful Seizure and False Imprisonment on March 9, 2019

366.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-365 as though fully set forth herein.

367.  On March 9, 2019, Hasper was stopped at gunpoint, and then held in a patrol car for over one hour, at the intersection of Carlls Path and Long Island Avenue, in Deer Park, New York, due to the false vehicle alarm which Defendants issued despite knowing that it was false.

368.  Defendants intended to have Hasper confined when they issued the false alarm and acted specifically to achieve this foreseeable goal, and Hasper was intentionally confined.

369.  Hasper did not consent to the confinement, he was confined against his will, and he was conscious of the confinement.

370.  Defendants caused Hasper to be unlawfully confined because they did not have probable cause to believe he committed a crime, and their confinement was without privilege or justification.

371.  Defendants therefore caused Hasper to be unlawfully seized, and falsely imprisoned, in violation of the New York State Constitution and laws.

## TWELVE
### Pendant State Claim – Unlawful Seizure and Search of Hasper's truck

372.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-372 as though fully set forth herein.

373.  On March 9, 2019, Hasper was stopped at gunpoint while driving his pickup truck, due to the false vehicle alarm which Defendants issued despite knowing that it was false.

374.  Defendants intended to have Hasper's truck seized and searched when they issued the false alarm, and acted specifically to achieve this foreseeable goal.

375.  Hasper had a reasonable expectation of privacy in his truck.

376.  Defendants did not have a warrant to seize or search Hasper's truck at any point in time, from when they issued the false alarm on February 15, 2019, through March 9, 2019 when D/Sgt. Hussain directed the SCPD to detain it and then directed a NCPD officer enter it and drive it away, or through the 10 days which followed during which time Defendants retained and searched the truck. Defendants did not either satisfy any exception to the warrant requirement, and had no other legal basis to seize or search the truck.

377.  Hasper did not consent to the seizure or search of his truck, either, or to Defendants retaining possession of it for ten days. In fact, through his criminal defense attorneys Hasper repeatedly demanded that his truck be returned, and he demanded an explanation as to Defendants' claimed legal basis for seizing, searching, and retaining possession of it.

378.  Defendants therefore caused Hasper's truck to be unlawfully seized, and they then unlawfully searched and retained possession of it, in violation of the New York State Constitution and laws.

## THIRTEEN
### Pendant State Claim – Unlawful Seizure and False Imprisonment on May 6, 2019

379.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-378 as though fully set forth herein.

380.  On May 6, 2019, Hasper was stopped, and was not free to leave for approximately 45 minutes, while he was driving southbound on the Cross Island Parkway, approximately two miles north of Northern Boulevard, due to the false vehicle alarm which Defendants issued despite knowing that it was false.

381.  Defendants intended to have Hasper confined when they issued the false alarm and acted specifically to achieve this foreseeable goal, and Hasper was intentionally confined.

382.  Hasper did not consent to the confinement, he was confined against his will, and he was conscious of the confinement.

383.  Defendants caused Hasper to be unlawfully confined because they did not have probable cause to believe he committed a crime, and their confinement was without privilege or justification.

384.  Defendants therefore caused Hasper to be unlawfully seized, and falsely imprisoned, in violation of the New York State Constitution and laws

## FOURTEEN
### Pendent State Claim – Respondeat superior/vicarious liability

385.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-384 as though fully set forth herein.

386.  Defendant Nassau County was, at all relevant times, the employer of Defendants D/Sgt. Russell, Det. Lunt, Det. Vacchiano, Det. Purcell, Det. Panuthos, Det. Roche, D/Sgt. Hussain, Lt. Troise, John Doe No. 1, and John Doe No. 2, as well as the additional police personnel whose conduct is at issue but whose identities are not yet known to Plaintiff but are known to Defendants.

387.  D/Sgt. Russell, Det. Lunt, Det. Vacchiano, Det. Purcell, Det. Panuthos, Det. Roche, D/Sgt. Hussain, Lt. Troise, John Doe No. 1, and John Doe No. 2, and the additional NCPD employees whose conduct is at issue, acted within the scope of their employment with Nassau County when they violated Hasper's rights and committed the various torts against him, as outlined above.

388.  As their employer, Nassau County is vicariously liable for their actions pursuant to the doctrine of respondeat superior.

**WHEREFORE**, Plaintiff requests the following relief jointly and severally as against all the defendants:

1. A trial by jury on all issues;

2. An award of compensatory damages in an amount to be determined at trial;

3. An award of punitive damages in an amount to be determined at trial;

4. Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as this Court may deem just and proper.

Dated: Mineola, New York
      May 26, 2020

Respectfully submitted,

The Law Office of Anthony M. Grandinette
*Attorneys for Plaintiffs*
114 Old Country Road, Suite 420
Mineola, New York 11501
(516) 877-2889

By:     s/ Anthony Grandinette
        Anthony M. Grandinette, Esq.
        Mirel Fisch, Esq.
