UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
WILLIAM F. HASPER,

                        Plaintiff,                         20-CV-02349 (RER)(LGD)

     -against-                             **PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT AND COUNTER-STATEMENT**

COUNTY OF NASSAU, DETECTIVE/SERGEANT
WILLIAM S. RUSSELL, DETECTIVE RYAN M.
LUNT, DETECTIVE VINCENZO VACCHIANO,
DETECTIVE THOMAS A. ROCHE, DETECTIVE
JOHN PURCELL, DETECTIVE JONATHAN
PANUTHOS, DETECTIVE/SERGEANT NABIL
HUSSAIN, and LIEUTENANT VALERIE F. TROISE,

                        Defendants.
------------------------------------------------------------------X

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, and Judge Reyes' Individual Practice Rule IV.A.3, Plaintiff William Hasper ("Hasper") respectfully submits this response to Defendants County of Nassau ("County"), Detective/Sergeant William S. Russell ("Russell"), Detective Ryan M. Lunt ("Lunt"), Detective Vincenzo Vacchiano ("Vacchiano"), Detective Thomas A. Roche ("Roche"), Detective John Purcell ("Purcell"), Detective Jonathan Panuthos ("Panuthos"), Detective/Sergeant Nabil Hussain ("Hussain"), and Lieutenant Valerie F. Troise ("Troise" and collectively "Defendants") Local Rule 56.1 Statement.

Further, Plaintiff respectfully avers that, in addition to those assertions made by the Defendants which are disputed here, this document is provided, pursuant to Rule 56.1 of the Local Civil Rules, as a Counter-Statement of Facts in support of Plaintiffs contentions that genuine facts are in dispute. The facts and contentions listed below in Plaintiffs Counter-Statement are not all-inclusive of each

and every disputed issue, but are provided to demonstrate that the level and complexity of the disputed issues which permeate this case. In addition, references provided in support of each of the issues raised are not all-inclusive, and are offered to comply with the Local Rule. Finally, Plaintiff objects to the Defendants improper misstatement of facts so as to lead to deceptive and inaccurate conclusions.

**Complaint**

1.      On February 15, 2019, there was an incident ("Incident") between Plaintiff and Russell in the parking lot of the Bethpage Federal Credit Union ("Bank") located at 750 Old Country Road in Westbury, New York.  Deposition Transcript of William Hapser ("Hasper Tr."), Exhibit A, 29:13-19; 36:9-15; Deposition Transcript of Sgt/Det William Russell ("Russell Tr."), Exhibit B, 7:13-15; 23:3-6.

**RESPONSE:** Admitted.

2.      As a result of the Incident, Plaintiff filed the above-captioned action interposing, Fourteen Claims for Relief.  Second Amended Complaint ("SAC"), Exhibit C, generally.

**RESPONSE:** Admitted.

3.      The SAC alleges eight federal Claims as follows:

   a.   "ONE 42 U.S.C. § 1983 – Malicious Prosecution (4th Amendment)." SAC ¶¶ 278-89.

   b.   "TWO 42 U.S.C. § 1983 – Due Process Fabricating/Falsifying Evidence (14th Amendment)." SAC ¶¶ 290-99.

   c.   "THREE 42 U.S.C. § 1983 – Unlawful Search of Hasper's home on February 15, 2019 (4th Amendment)." SAC ¶¶ 300-04.

   d.   "FOUR 42 U.S.C. § 1983 – Unlawful Seizure and False Imprisonment on March 9, 2019 (4th Amendment)." SAC ¶¶ 305-14.

2

e. "FIVE 42 U.S.C. § 1983 – Unlawful Seizure and Search of Hasper's truck (4th Amendment)." SAC ¶¶ 315-26.

f. "SIX 42 U.S.C. § 1983 – Supervisory Liability as to D/Sgt. Hussain." SAC ¶¶ 327-31.

g. "SEVEN 42 U.S.C. § 1983 – Unlawful Seizure and False Imprisonment on May 6, 2019 (4th Amendment)" SAC ¶¶ 332-40.

h. "EIGHT 42 U.S.C. § 1983 – Due Process Violations due to the continued harassment (14th Amendment)." SAC ¶¶ 341-47.[1]

**RESPONSE:** Admitted.

4. The remaining six Claims are pendant state law claims alleging malicious prosecution, falsifying evidence, two claims for unlawful seizure/false imprisonment, unlawful seizure and search of Plaintiff's truck, and respondeat superior. SAC ¶¶ 348-84.

**RESPONSE:** Admitted.

5. The First through Seventh Claims ("§ 1983 Claims") in the SAC allege the individual defendants violated Plaintiff's constitutional rights based on a combination of direct participation and conspiracy allegations. *See, e.g.,* SAC, ¶¶ 2, 193-204, 109-16, 136, 157-58, 162-63, 166, 171, 173, 197, 211, 281-83, 293-95, 312, 324, 338.

**RESPONSE:** Admitted.

6. The SAC contains group-pleading assertions that "the police personnel at the scene, *including all individually-named defendants*" shared "a common goal," "agreed" to a "false narrative," and "participated" in "fabricating" documents. SAC ¶¶ 2, 193-204, 109-16, 157-58, 162-63, 171-73, 197, 211, 281-83, 293-95, 312, 324, 338 (emphasis added).

**RESPONSE:** Disputed. The following SAC paragraphs do not contain group pleading assertions: SAC ¶¶ 109, 110, 111, 112, 113, 114, 116, 194, 195, 196, 198, 200, 201 202, 204.

---

[1] By Decision and Order dated December 14, 2021, the Hon. William F. Kuntz, II dismissed the Eighth Claim for continued harassment. DE 26, pp. 1-2. And so, inclusion in the Second Amended Complaint appears inadvertent.

3

7.    The SAC does not include any particularized factual allegations establishing who agreed with whom, when the agreement was formed, or the specific contours of any alleged agreement.  *See* SAC, generally.

**RESPONSE:** Disputed. *See* SAC, generally.

8.    The SAC does not allege, and discovery produced no evidence of an official County policy, custom, written directive, ordinance, officially promulgated or practice that purportedly caused Plaintiff to be deprived of a constitutional right. *See* SAC, generally.

**RESPONSE:** Disputed. *See* SAC, generally.

9.    The SAC does not allege, nor does any record evidence establish an alleged failure-to-train, supervise, or discipline theory as against the County. *See id.,* generally.

**RESPONSE:** Disputed. *See* SAC, generally.

**Defendants' Employment**

10.    On February 15, 2019, and at all times relevant to this lawsuit, Russell was employed by the Nassau County Police Department ("NCPD") and acting within the scope of his employment. Russell Tr. 27:3-6; 183:4-25; SAC ¶ 7-8.

**RESPONSE:** Admitted in part. Russell was at the credit union conducting private business. Russell was acting in his official and individual capacity. SAC ¶ 8.

11.    On February 15, 2019, and at all times relevant to this lawsuit, Lunt was employed by the NCPD and acting within the scope of his employment. Deposition Transcript of Det. Ryan Lunt Tr. ("Lunt Tr."), Exhibit D, 11:17-12:23; SAC ¶¶ 7, 9.

**RESPONSE:** Admitted in part. Lunt was also acting in his individual capacity. SAC ¶ 9.

12.    On February 15, 2019, and at all times relevant to this lawsuit, Vacchiano was employed by the NCPD and acting within the scope of his employment.  Deposition Transcript of Det. Vincent Vacchiano ("Vacchiano Tr."), Exhibit E, 11:4-15; 12:18-13:21, SAC ¶¶ 7, 10.

**RESPONSE:** Admitted in part. Vacchiano was also acting in his individual capacity. SAC ¶ 10.

13.    On February 15, 2019, and at all times relevant to this lawsuit, Roche was employed by the NCPD and acting within the scope of his employment. Deposition Transcript of Det. Thomas Roche ("Roche Tr."), Exhibit F, 12:3-5, 38:16-19; SAC ¶¶ 7, 11.

**RESPONSE:** Admitted in part. Roche was also acting in his individual capacity. SAC ¶ 11.

14.    On February 15, 2019, and at all times relevant to this lawsuit, Purcell was employed by the NCPD and acting within the scope of his employment. Deposition Transcript of Det. John Purcell ("Purcell Tr."), Exhibit G, 6:21-7:17; SAC ¶¶ 7, 12.

**RESPONSE:** Admitted. While Plaintiff consents to dismissing all claims against Purcell, Plaintiff reserves the right to call Purcell as a witness at trial.

15.    On February 15, 2019, and at all times relevant to this lawsuit, Panuthos was employed by the NCPD and acting within the scope of his employment. Deposition Transcript of Det. Jonathan Panuthos ("Panuthos Tr."), Exhibit H, 9:20-10:14, 11:22-25, 14:8-24; SAC ¶¶ 7.

**RESPONSE:** Admitted. While Plaintiff consents to dismissing all claims against Panuthos, Plaintiff reserves the right to call Panuthos as a witness at trial.

16.    On February 15, 2019, and at all times relevant to this lawsuit, Hussain was employed by the NCPD and acting within the scope of his employment.  Deposition Transcript of Sgt/Det. Nabil Hussain ("Hussain Tr."), Exhibit I, 16:22-19:15; SAC ¶¶ 7, 14.

5

**RESPONSE:** Admitted in part. Hussain was also acting in his individual capacity. SAC ¶ 14.

17.     On February 15, 2019, and at all times relevant to this lawsuit Troise was employed by the NCPD and acting within the scope of her employment. Deposition Transcript of Lt. Valerie F. Troise ("Troise Tr."), Exhibit J, 13:17-16:9, 20:1-17; SAC ¶¶ 7, 15.

**RESPONSE:** Admitted. While Plaintiff consents to dismissing all claims against Troise, Plaintiff reserves the right to call Troise as a witness at trial.

18.     The County is a municipality within the State of New York under which the NCPD – the employer of the individually-named defendants in this action – is organized. SAC, ¶ 7.

**RESPONSE:** Admitted.

**Individual Defendants**

**Lieutenant Valerie F. Troise**

19.     Troise has not spoken to or had any contact with any co-defendant since the date of the Incident. Troise Tr., 8:6-14.

**RESPONSE:** Admitted.

20.     Troise was not a witness at, or involved, in any way, with the criminal trial, *People v. William Hasper. Id.* 8:15-9:23.

**RESPONSE:** Admitted.

21.     Troise never worked with Russell during her time with the NCPD, did not know Russell socially, personally, or professionally, and prior to the incident forming the basis of this lawsuit did not know who Russell was.  *Id.* 21:17-22:3.

**RESPONSE:** Admitted.

6

22.     Troise knew of Lunt because they both worked in the Third Precinct, but they did not work together, and had no social, personal, or professional relationship.  *Id.* 22:4-18; Lunt Tr. 15:16-16:3.

**RESPONSE:** Admitted.

23.     Troise does not know and is not familiar with Vacchiano, Panuthos, or Hussain.  *Id.* 22:22-23, 24:2-4, 24: 8-13.

**RESPONSE:** Admitted.

24.     Troise was dispatched to the scene through the 911 emergency call system because a patrol supervisor was requested at the scene.  *Id.* 32:8-12, 68:21-69:2.

**RESPONSE:** Admitted.

25.     Troise did not speak with any law enforcement officer before arriving at the scene and her sole involvement relating to the allegations in the Complaint was completing the accident report MV-104A form ("Form"), with her responsibilities, duties, and actions ceasing at that point. *Id.* 34:4-7; 68:21-69:2; 54:4-9; 57:17-22; Form, Exhibit K.

**RESPONSE:** Admitted.

26.     Troise prepared the Form based solely on information provided by Russell, as Plaintiff had fled the scene before Troise arrived.  *Id.* 58:5-20; 67:8-10.

**RESPONSE:** Disputed. Defendant did not flee the scene, he carefully drove away from the parking lot to avoid a volatile road rage incident instigated by Russell, which may have turned physical. SAC ¶¶ 69-79, 99.

27.     Troise has no knowledge of whether any additional, subsequent or other reports were completed and was not involved in deciding whether Plaintiff would be arrested.  *Id.* 57:13-16; 69:25-70:4.

**RESPONSE:** Admitted.

**Detective John Purcell**

28.     Purcell's involvement in relating to the allegations in the Complaint is limited.  He went to Plaintiff's last known address on one occasion on February 15, 2019, and on February 16, 2019, he canvassed for relevant video evidence of the Incident. Purcell Tr. 12:9-25. 41:22-42:2, 44:17-46:4.

**RESPONSE:** Admitted.

29.     Purcell was not present at the scene of the Incident.  *Id.* 13:2-4.

**RESPONSE:** Admitted.

30.     Prior to the Incident Purcell had no dealings with, and no knowledge of Russell. *Id.* 23:10-16.

**RESPONSE:** Admitted.

31.     Purcell did not engage in any discussion, meeting, or conference about how the investigation of the Incident would be conducted.  *Id.* 24:7-12.

**RESPONSE:** Admitted.

32.     Purcell was not the lead investigator, nor was he the second (associate lead) or third in charge of the investigation.  *Id.* 38:10-24.

**RESPONSE:** Admitted.

33.     Purcell went to Plaintiff's apartment complex once when no one was home and never returned.  *Id.* 43:23-44:24; 50:19-25.

**RESPONSE:** Admitted.

34.     Purcell did not place the alarm on Plaintiff's truck, did not know who placed it, and only became aware of it days later.  *Id.* 53:21-54:23.

**RESPONSE:** Admitted.

**Detective Jonathan Panuthos**

35.     Panuthos had a friendly working relationship with Hussain, Vacchiano, Purcell, and Lunt but never met their families, never spent time in their homes and never spent time personally with these individuals.  At some time after 2019, after leaving the Third Precinct, Panuthos became closer friends with Lunt. Panuthos Tr. 15:19-17:11.

**RESPONSE:** Admitted.

36.     Panuthos knew of Russell because they both worked in the Third Precinct for a period and were friendly in passing but did not "overlap [ ] in anything or work in the same squad" or have any relationship outside of work.  *Id.* 19:7-21:11.

**RESPONSE:** Admitted.

37.     Prior to responding to the scene on the day of the Incident, Panuthos had no direct dealings with Russell and did not receive any calls or communications from Russell.  *Id.* 26:2-8.

**RESPONSE:** Admitted.

38.     Panuthos' involvement relating to the allegations in the Complaint was limited to canvassing for video recordings of the Incident, having "went essentially straight into the 711" convenience store for this purpose, which took a substantial amount of time.  *Id*. 26:23-27:3, 29:25-30:3, 31:16-23, 32:15-21, 38:17-24; Vacchiano Tr. 58:23-59:4.

**RESPONSE:** Admitted.

9

39.    As part of the video-capture process Panuthos, together with Lunt and Vacchiano, reviewed video footage in the 7-Eleven convenience store taken from a camera mounted on the store that recorded some of the Incident.  *Id.* 36:6-19; Panuthos Tr. 59:23-60:9.

**RESPONSE:** Admitted.

40.    Panuthos did not speak with the security guard at the Bank and does not recall speaking with any civilian at the scene other than the manager/owner of the 7-Eleven convenience store. *Id.* 28:3-19.

**RESPONSE:** Admitted.

41.    After finding the relevant video footage, Panuthos went to Plaintiff's last known address on February 15, 2019, knocked on the front door, left when no one answered, and never returned. *Id.* 34:12-16, 35:17-20, 41:8-42:19.

**RESPONSE:** Admitted.

42.    Other than canvassing for video and knocking on Plaintiff's door, Panuthos had no involvement in the investigation of the Incident (*id.* 42:24-43:5), learning only months later of an alarm being placed on Plaintiff's truck and not knowing who placed the alarm (*id.* 45:11-46:7).

**RESPONSE:** Admitted.

43.    Panuthos has not spoken to or seen Russell since February 15, 2019. *Id.* 50:19-21.

**RESPONSE:** Admitted.


**Detective Vincent Vacchiano**

44.    Vacchiano had a friendly working relationship with Russell during the approximately five years the two worked at the Third Precinct but the two did not socialize, never

attended functions together, and did not supervise one another at any point in time. Vacchiano Tr., 15:24-16:21.

**RESPONSE:** Admitted in part. Vacchiano was friendly enough to call Russell by his nickname Sean. *See* Exhibit B, Vacchiano Tr. 57:17-24.

45.     Vacchiano was not part of the decision to arrest Plaintiff (*Id.* 63:2-7, 76:17-24).

**RESPONSE:** Admitted.

46.     Before the decision to arrest Plaintiff was made, and as part of the investigative process, Vacchiano, while at the 7-Eleven convenience store, reviewed video recordings capturing the Incident. *Id.* 59:23-60:22; Panuthos Tr., 36:6-19.

**RESPONSE:** Admitted.

47.     Vacchiano did not view any recordings of the interior of the Bank. Vacchiano Tr. 85:24-86:9.

**RESPONSE:** Admitted

48.     Vacchiano was not part of the process that resulted in an alarm being placed on Plaintiff's truck and first became aware of the alarm after Plaintiff's truck was stopped. *Id*. 80:16-81:11.

**RESPONSE:** Admitted.

**Detective Thomas Roche**

49.     Roche knew of Russell prior to the date of the Incident, with both having worked for some overlapping period of time in the Third Precinct and perhaps on the same shift, but they never worked in the same patrol car, never went out to dinner or spent private time together, and did not have a social relationship. Roche Tr. 20:5-21:21.

11

**RESPONSE:** Admitted.

50.     The Incident took place hours before Roche's night shift started and Roche never went to the scene of the Incident. *Id*. 64:14-65:12, 69:20-70:4.

**RESPONSE:** Admitted.

51.     Roche did not speak to Russell about the Incident.  *Id.* 73:2-13.

**RESPONSE:** Denied. Roche does not think he ever spoke with Russell about the incident. *See* Exhibit C, Roche Tr. 73:5-13.

52.     Roche's involvement in the investigation of the Incident was limited to placing an alarm on Plaintiff's truck and going to his residence to look for him.  *Id.* 73:14-20, 95:18-21.

**RESPONSE:** Admitted in part. Roche also failed to update the car Alarm when plaintiff's truck was returned resulting in his second traffic stop and detention. *See* Exhibit D, Hussain Tr. 73:7-10.

53.     Roche determined what language the alarm would include. *Id.* 84:5, 89:6-8.

**RESPONSE:** Disputed in part. Roche determined what information to include in the car alarm, including that Plaintiff was armed and dangerous, the car was stolen, and Plaintiff intentionally assaulted a Nassau County Police officer. *See* Exhibit E, E-Justice Portal Alarm ("Alarm") and cancellation.

54.     Within the alarm system, certain fields such as "Header" had to be populated to allow an alarm to be issued, and as a result "stolen" was selected from the limited available header choices within the drop-down box. All sub-categories relating to an alleged auto-theft were left unpopulated except for the "miscellaneous" category that was populated with a detailed narrative of the Incident that Roche confirmed to be accurate.  Roche Tr. 89:9-92:12, 94:15-20, 106:4-108:23; E-Justice Portal Alarm ("Alarm"), Exhibit L.

**RESPONSE:** Disputed. Roche was responsible for specific false facts entered on the Alarm, including that Plaintiff was armed and dangerous, the vehicle was stolen and Plaintiff assaulted a police officer. *See* Exhibit E, Alarm; Roche Tr. 88:14-89:8.

55.     When Roche went to Plaintiff's residence to look for Plaintiff, he knocked on the front door of the residence and a woman, Lija Todoran answered, saying Plaintiff was not home. Roche Tr. 97:20-25.  Roche did not barge into the home (Deposition Transcript of Lija Todoran ["Todoran Tr."], Exhibit M, 35:20-24) and was instead given permission to enter. Roche Tr., 97:20-98:11, 99:14-22.

**RESPONSE:** Disputed. Roche and other officers did not ask permission to come in, they just barged in and walked through the house looking for Plaintiff. *See* Exhibit F, Todoran Tr. 35:20-36:4.

56.     Roche was not involved in Plaintiff's arrest and did not testify at Plaintiff's criminal trial. *Id.* 74:13-16, 104:12-14.

**RESPONSE:** Admitted.


**Detective Sergeant Nabil Hussain**

57.     Hussain first met Russell on the day of the Incident and did not, prior to the Incident, know, speak with, work with, or socialize with, Russell. Hussain Tr. 20:24-21:3, 31:2-13.

**RESPONSE:** Admitted.

58.     At the time of his deposition on August 20, 2024, Hussain did not know Troise personally and did not know to which bureau she was assigned.  *Id.* 36:7-15.

**RESPONSE:** Admitted.

59.     Upon learning of the Incident Hussain drove himself to the scene. *Id.* 29:24-30:2.

13

**RESPONSE:** Admitted.

60.    There was no group meeting before the investigation of the Incident began. *Id.* 39:5-9.

**RESPONSE:**  Denied. There was a group meeting during the investigation with Roche and three supervisors: Hussain, Burrain and Velte. Roche Tr. 66:12-67:18.

61.    Hussain was aware a written statement had been taken from the Bank security guard but was not present when it was taken, did not listen to the interview of the security guard, was not sure who took the statement, and does not believe he ever read it. *Id.* 40:12-41:20.

**RESPONSE:** Admitted.

62.    Hussain agreed with Lunt's decision to arrest Plaintiff and authorized that action. *Id.* 44:18-47:11. Hussain went to Plaintiff's apartment complex from the scene but Plaintiff was not home. *Id.* 49:10-20. Hussain went only once to Plaintiff's home. *Id.* 80:18-81:5.

**RESPONSE:** Admitted.

63.    Lunt decided to issue an Alarm on Plaintiff's truck to authorize law enforcement to stop and take custody of the truck for evidentiary purposes and Hussain approved that decision. *Id.* 58:2-59:5, 61:4-9.

**RESPONSE:** Admitted.

64.    Hussain did not do anything to update or cancel the Alarm after Plaintiff's truck was retrieved as it was not his responsibility but rather the responsibility of the person who placed the Alarm. *Id.* 72:8-17, 73:7-10.

**RESPONSE:** Admitted.

**Detective Ryan M. Lunt**

65.     Lunt did not know Russell prior to, and first met Russell in connection with, the Incident.  Lunt Tr. 16:4-19.

**RESPONSE:** Admitted.

66.     Lunt was the so-called catching (a/k/a lead) detective for the Third Precinct Detective Squad on February 15, 2019.  *Id.* 29:15-22.

**RESPONSE:** Admitted.

67.     Lunt interviewed and obtained a written statement from the bank security guard, Cameron Grady, regarding the Incident. Lunt Tr. 43:21-44:9, 49:2-8.

**RESPONSE:** Admitted in part. Lunt, Vacchiano and other officers interviewed the bank security guard, Cameron Grady and Lunt obtained a written statement from Grady, regarding the incident containing false information. *See* Exhibit G, Lunt Tr. 44:10-15, 47:21-44:15; s*ee also* Exhibit H, Grady Tr. 61:3-62:10.

68.     Lunt went from the scene of the Incident to Plaintiff's last known residence, but Plaintiff was not home. *Id.* 73:19-74:6.

**RESPONSE:** Admitted.

69.     As the carrying detective, Lunt decided to place an Alarm on Plaintiff's truck because the truck was used in the commission of, and was evidence of, a crime. *Id.* 79:15-80:2, 80:7-15, 81:18-82:3.

**RESPONSE:** Admitted.

70.     Lunt did not place the Alarm on Plaintiff's truck but had someone call the office to request the Alarm. *Id.* 82:4-7.

**RESPONSE:** Denied. Lunt, Hussain and Roche and other supervisors decided to place an Alarm. Roche Tr. 74:17-75:17.

71.    Lunt learned that Roche facilitated placing the Alarm and provided information to a police officer responsible for entering alarm data into the Alarm system. *Id.* 82:10-11, 83:14-85:3, 92:16-25, 94:12-21.

**RESPONSE:** Denied. Roche did not facilitate the Alarm. He provided the information that was entered into the alarm system. Roche Tr. 84:3-5.

72.    Lunt was not working when Plaintiff's truck was recovered on March 9, 2019 (*id.* 114:12-14).

**RESPONSE:** Admitted.

73.    The Alarm was not immediately cancelled upon recovery of the truck (*id.* 115:14-116:23), in part because none of the detectives working at the time of the recovery cancelled it.

**RESPONSE:** Denied. The Alarm was not cancelled upon the recovery of the truck and continued open and active for 48 days after the truck was returned. Neither Lunt, Hussain or Roche cancelled the Alarm when the truck was recovered or any time before Plaintiff was stopped a second time. *See* Exhibit E, Alarm.

74.    Lunt acknowledged that, as the person who requested the Alarm on the truck, it was his responsibility to ensure the Alarm was updated.  *Id.*

**RESPONSE:** Admitted in part. Roche was also responsible for cancelling the Alarm. Hussain Tr. 72:14-73:10.

75.    When Lunt learned Plaintiff was stopped a second time by law enforcement due to the Alarm he cancelled the Alarm. *Id.* 117:13-22.

**RESPONSE:** Admitted.

**Plaintiff's Indictment, Bench Trial, Conviction, and Appeal**

76.     On May 9, 2019, Plaintiff was indicted in the County Court for the County of Nassau on the following crimes and violations under Indictment No. 778N-19: Count 1: Assault in the Second Degree; Count 2: Assault in the Third Degree; Count 3: Reckless Endangerment in the Second Degree; Count 4: Leaving the scene of an incident involving personal injury; Count 5: Unsafe left turn/failure to signal; Count 6: Covered or distorted license plate; and Count 7: Equipment—inadequate brakes, steering, or horn. SAC ¶ 260 and Plaintiff's Exhibit O thereto.

**RESPONSE:** Admitted.

77.     On February 5, 2020, at the conclusion of a bench trial before the Hon. Christopher Quinn, Plaintiff was found Not Guilty on Count 1, Count 2, and Count 4 and was found Guilty on Count 3, Count 5, Count 6, and Count 7. SAC ¶ 271.

**RESPONSE:** Admitted.

78.     Plaintiff appealed his convictions on Counts 3 and 5-7, but on January 21, 2026, the Appellate Division of the Supreme Court of the State of New York for the Second Judicial Department denied Plaintiff's appeal and affirmed his conviction in a written Decision and Order. *The People, etc., v. William Hasper*, (Docket No. 2021-03280), 2026 NY Slip Op 00259, -- AD3d -- (2d Dep't, January 21, 2026), Exhibit N.

**RESPONSE:** Admitted in part. After the Plaintiff's appeal was denied by the Appellate Division of the State of New York for the Second Judicial District, Plaintiff requested leave to appeal to the New York State Court of Appeals. That request is still pending. *See* Exhibit I, Leave Letter.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS

**William F. Hasper**

1.  In 2019 Plaintiff lived in an apartment in Garden City with his girlfriend Lia Todoran. Deposition Transcript of William F. Hasper, Exhibit J, 5:12-20.

2.  Plaintiff retired from the Suffolk County Police Department as a lieutenant in 2012. *Id.* 6:2-7.

3.  On February 17, 2019, Plaintiff was driving to the Bethpage Federal Credit Union located on Old Country Road in Westbury in his 2015 GMC Sierra Denali. *Id.* 29:3-19.

4.  An altercation ensued between Plaintiff and Russell when Russell's vehicle was blocking Plaintiff's vehicle from entering the parking lot and Plaintiff beeped his horn to request Russell to move forward. *Id.* 33:17-37:9.

5.  Plaintiff's vehicle did not bump, strike or run over Russell. *Id.* 58:21-59:-17; Grady Tr., 83:15-19.

6.  Russell never displayed his police shield to Plaintiff. Hasper Tr., 86:5-6; Grady Tr., 66:6-19; Exhibit K, 7-Eleven Video; Exhibit L, Bank Video.

7.  The surveillance video after Plaintiff exited the parking lot depicts defendant Russell sprinting back to his car and exhibiting no apparent injury to his right knee or right foot after Plaintiff left the parking lot. Hasper Tr. 91:16-25; Grady Tr. 66:20-25; Exhibit K, 7-Eleven Video; Exhibit L, Bank Video.

8.  When Plaintiff returned to the scene of the incident later in the day, he spoke with security guard Cameron Grady who told him that he saw the entire incident and that he believed Plaintiff was a gentleman and the other man (Russell) was unhinged and was off the rails. Hasper Tr. 64:11-17; Grady Tr. 65:2-18.

18

9.      As a result of Plaintiff's arrest for intentional felony assault and leaving the scene of motor vehicle accident, he was forced surrender numerous firearms that he lawfully possessed. Hasper Tr. 136:10-137:20.

10.     On February 18, 2019, Plaintiff was informed that due to his arrest his pistol license was suspended. *Id.* 94:19-25.

11.     On February 17, 2019, with the assistance of counsel, Plaintiff self-surrendered to the Nassau County Police Department Third Precinct. He was then charged with Intentional Assault in the Second Degree, P.L. § 120.05, Leaving the Scene of an Accident with Personal Injury, V.T.L. § 600(2)(a),  Unsafe Turn/Failure to Signal, V.T.L. § 1163-a, Improper Cover of a License Plate, V.T.L. § 402(1)(b), and Use of a Horn that was Unnecessarily Loud or Harsh V.T.L. § 375(1)(a). *See* Exhibit M, Felony Complaint.

12.     Lunt told Plaintiff that he was not going to receive any special treatment because he was a former police officer because he "fucked with one of their own" (meaning Russell) who worked at this precinct for over ten years. Lunt told Plaintiff that he was going to be transported and held in custody in general population. Hasper Tr. 124:6-127:25

13.     Despite having a serious prior back injury and requesting Lunt to front cuff him, Plaintiff was rear cuffed and placed in the rear a of police car and driven to police headquarters. *Id.* 124:16-126:10.

14.     The next morning after his self-surrender and arrest, Plaintiff requested for his safety to be kept in segregation away from other arrestees because he was a former law enforcement officer. He was transported from Nassau County Police Department Headquarters to the First District Court in Hempstead in a police van with approximately 10 other prisoners. *Id*. 128:2-129:9

19

15.     Plaintiff was held in a holding cell with other recent arrestees at the First District Court in Hempstead because Lunt did not notify others or make appropriate notification on paperwork to keep Plaintiff segregated because he was a former law enforcement officer. *Id.* 131:19-25.

16.     Plaintiff was held in a holding cell at the First District Court in Hempstead with other recent arrestees from early morning to late afternoon when his case was the last case called on the court calendar. *Id.* 132:22-133:2.

17.     On March 9, 2019, two Suffolk County Police patrol officers stopped Plaintiff while he was driving the subject vehicle, his 2015 GMC Sierra, in Deer Park. After Plaintiff was stopped, the officers pointed guns at him and demanded that he lie face down on the pavement, where he was handcuffed and searched and detained for approximately one hour because the Alarm contained false information that Plaintiff was operating a stolen vehicle and was armed and dangerous. *Id.* 103:19-104:6.

18.     The Suffolk officers stopped the vehicle because of the car Alarm placed by defendant Lunt and entered by Roche containing false information that Plaintiff was armed and dangerous, and that the car was stolen. The Alarm also falsely stated that Plaintiff was wanted for assaulting a Nassau County police officer. *Id.* 103:19-104:6.


**Security Guard Cameron Grady**

19.     Cameron Grady was a security guard at the Bethpage Federal Credit Union when the incident took place. Deposition Transcript of Cameron Grady, Exhibit H, 13:9-20.

20.     Grady recognized the bank video of the incident. *Id.* 14:24-16:22; Exhibit L, Bank Video.

21.     Grady spoke with police officers for about 15 minutes after they arrived. Grady Tr. 57:4-8.

22.     Grady met with officers in a bank cubicle. *Id.* 57:11-58:5.

23.     The officers ask Grady about the incident from start to finish. *Id.* 59:18-60:6.

24.     Grady recalls speaking with Lunt and four or five other officers. *Id.* 61:3-62:10.

25.     Grady told Lunt and the other officers that the guy in the suit (Russell) was the aggressor. *Id.* 65:2-8.

26.     Grady told Lunt and the others that plaintiff was cool and calm. *Id.* 65:9-18.

27.     Grady told Lunt and the others that he yelled at the man in the suit to get out of the way because Plaintiff was just trying to leave. *Id.* 65:19-66:5.

28.     Grady told Lunt and the others that the man in the suit never identified himself as a police officer or displayed a shield or other identification indicating he was a police officer. *Id.* 66:6-19.

29.     Grady told Lunt and the others that the man in the suit never appeared to suffer an injury. *Id.* 66:20-25.

30.     Grady told Lunt and the others he never saw a cop act like that before. *Id.* 67:22-25.

31.     Grady saw Lunt write notes during his interview. *Id.* 69:3-6.

32.     Grady met with Lunt and the others for about 30 minutes. *Id.* 68:23-69:2.

33.     Lunt and the others presented Grady with a written statement to sign. *Id.* 69:11-14.

34.     Prior to signing the statement, Grady did not really read it because he was still working and briefly looked at it and signed it where Lunt and the others told him to sign. *Id.* 70:12-16.

21

35.     Grady did not fully read the statement because they were cops and thought they would write down what he told them happened. *Id.* 71:3-7.

36.     When Grady did come into possession of his statement, he was surprised to learn Lunt and the others did not actually write down what he told them on February 15, 2019 at the bank because he expected police to do the right thing. *Id.* 71:8-23.

37.     When Grady read the statement that Lunt and the others wrote and he signed, he wrote a handwritten letter to Judge Quinn (the Judge presiding over Plaintiff's criminal case) telling him the truth of what happened at the bank on February 15, 2019, and not what Lunt and the others wrote in the statement he signed. *See* Exhibit N, Grady's Letter to Judge Quinn.

38.     The statement that Lunt and the others took from Grady contained the following false information that Grady did not state: 1. What plaintiff looked like. 2. That plaintiff told me "he was in an argument outside with another guy and he called the cops, so I'll be back later." 3. I saw the black pickup truck (plaintiff's truck) reverse and intentionally bump into the male white in the suit multiple times until he pushed him out of the way. 4. I saw the male white in the suit (Russell) in front of the pickup and the pickup operator (Plaintiff) intentionally bump the male in the suit. 5. I yelled to the man in the suit to let go because I was afraid he was gonna get run over after the incident occurred. These statements written by Lunt were not true or accurate. Grady Tr. 87:23-88:4.

**Detective Jonathan Panuthos**

39.     From 2004 to 2019 Panuthos was employed as a Nassau County police officer assigned to the Third Precinct. Deposition Transcript of Det. Jonathan Panuthos, Exhibit O, 10:15-23.

40.    In 2019, Panuthos became a detective and he was assigned to the Third Precinct. *Id.* 11:22-25.

41.    As a detective in the Third Precinct, Panuthos was assigned to a team that included Hussain, Vecchio, Purcell and Lunt. Hussain was the lead officer. *Id.* 12:5-13:9.

42.    On February 15, 2019, Panuthos along with other members of his team responded to the scene of the incident at the Bethpage Federal Credit Union located at 750 Old Country Road in Westbury. *Id.* 23:11-21.

43.    Panuthos was responsible for canvassing the area of the scene for video cameras and possible recordings of the events. *Id.* 32:15-16.

44.    Panuthos, Lunt and Vacchiano viewed camera footage of the encounter involving Plaintiff and Russell from a 7-Eleven camera. *Id.* 36:13-25.

**Detective Vincent Vacchiano**

45.    Vacchiano spoke with Lunt, Purcell and 'maybe' Hussain about the Incident. Deposition Transcript of Det. Vincent Vacchiano, Exhibit B, 8:18-9:8.

46.    Hussain was Vacchiano's supervisory sergeant. *Id.* 10:25-11:3.

47.    Vacchiano was an officer in the Third Precinct from approximately ten years, June 1999 to April of 2019. *Id.* 13:15-19.

48.    Vacchiano had known Russell approximately 5 years at the time of the incident in February of 2019. *Id.* 15:5-15.

49.    Vacchiano has a friendly relationship with Russell. *Id.* 16:5-12.

50.    Vacchiano worked approximately 100-500 cases together with Lunt. *Id.* 21:16-23:6.

23

51.    Vacchiano has worked approximately 200 cases with Roche. *Id.* 23:7-18.

52.    Vacchiano has worked approximately 100-300 cases with Panuthos. *Id.* 23:22-25.

53.    Vacchiano describes seeing Internal Affairs Inspector Stillman and Chief of Detectives Sewell at the scene. *Id.* 39:20-24, 40:5-41:2.

54.    Vacchiano was surprised to see Stillman and Sewell at the scene because it is not common for them to be there. *Id.* 41:5-9.

55.    Vacchiano heard Russell is called "Shawny" and "Sean." Vacchiano used to call him Sean. *Id.* 57:13-58:12.

56.    The decision was made at the scene to arrest Plaintiff. *Id.* 59:9-14.

57.    At the scene, Russell requested that Plaintiff be arrested for intentional assault in the second degree. *Id.* 72:13-16.

58.    Vacchiano knows the decision to make an arrest or obtaining a search warrant to be both the decision of the catching (lead) detective and the cumulative of the detective team's discussion and decision. *Id.* 76:5-12.

**Detective Thomas Roche**

59.    Roche was assigned to the Third Precinct in October of 2005. Deposition Transcript of Det. Thomas Roche, Exhibit C, 13:24-14:12.

60.    While Roche was in the Third Squad, he met Russell. They first met on patrol, when they were both patrol officers at the Third Precinct. *Id.* 19:20-20:12.

61.    Roche and Russell were friendly with one another. *Id.* 20:23-21:17.

62.     Roche and Vacchiano met in the Third Precinct when he was a plain clothes officer. They have a friendly relationship and socialize at police events. They have shared lunch or dinner while on break from duty. *Id.* 22:3-24:14.

63.     Roche and Panuthos have shared meals and break time together. *Id.* 24:22-25:2.

64.     Roche worked with Lunt in the Fifth Squad when Lunt was on patrol. *Id.* 26:5-27:12.

65.     Roche knew Hussain in the Fifth Precinct while Hussain was a patrol officer. They possibly shared investigations. *Id.* 29:16-25.

66.     Hussain was the victim of a crime while on duty, Roche was assigned to investigate the incident. *Id.* 30:2-32:3.

67.     Roche transferred to the Third Squad in July of 2012, where he remained until June of 2020. *Id.* 38:9-19.

68.     Roche possibly worked together with Russel at Third Precinct, possibly shared social events relating to police activities. *Id.* 39:2-20.

69.     Roche and Lunt were both assigned to the Third Squad as detectives. They possibly worked together on investigations prior to the incident with Russell, but not after. *Id.* 39:21-41:8.

70.     Roche knows Hussain well. *Id.* 52:12-53:12.

71.     Roche was asked to take Plaintiff's investigation by Detective/Sergeant Hussain, Detective Burrain and he believes Detective/Lieutenant Velte. *Id.* 65:13-66:6.

72.     When Roche started duty that afternoon, supervisors Hussain, Burrain and Velte together with Roche had a meeting where they explained the incident that took place at the bank. Roche recalls being told that Russell was almost hit by a car as he attempted to take police action but the person left. *Id.* 66:12-67:5.

25

73.     Roche was told by Lunt that Russell was almost hit by the Plaintiff's car. He doesn't recall if Lunt said Russell had any injuries. *Id.* 72:18-25.

74.     Roche along with the supervisors decided to place the Alarm on Plaintiff's car. *Id.* 74:17-75:9.

75.     Roche does not recall anyone saying anything about Plaintiff's use of firearms during the incident. *Id.* 80:7-10.

76.     Roche does not recall Plaintiff being armed or carrying a weapon at the time. *Id.* 82:10-21.

77.     Roche determined the language that should be used on the Alarm. *Id.* 84:3-5

78.     Roche admits that it the Alarm should have read "attempted assault" and it was his mistake that it instead said "assault." *Id.* 85:7-14.

79.     Because Plaintiff was wanted as a subject in the case, and they had already spoke to him in which he refused to come in, they went to his address with the intention of arresting him for attempted assault on a police officer. *Id.* 96:20-97:5.

80.     Roche recalls speaking with an attorney wherein he said he was told to leave the residence and would have Plaintiff contact them the following day. *Id.* 101:3-25.

**Detective Sergeant Nabil Hussain**

81.     Hussain was assigned to the Third Squad Detectives from 2016 to 2021. Deposition Transcript of Sgt/Det. Nabil Hussain, Exhibit D, 19:3-11.

82.     Hussain first learned of the Incident from Lunt who told him there was an Incident at the Bethpage Credit Union where an officer was hurt. *Id.* 24:17-26:2.

26

83.     Upon learning of the Incident involving Russell, Hussain went to the scene with Lunt, Purcell and Panuthos. *Id*. 27:21-28:9.

84.     Hussain was the supervisor of the team. *Id*. 28:5-9.

85.     Hussain knows Russell's first name to be Sean. *Id*. 30:17-23.

86.     Hussain spoke with Russell at the scene with Vacchiano and Lunt. *Id*. 32:5-8.

87.     Hussain learned from Russell that he was assaulted by a gentleman in the parking lot and he had called the police and while he was waiting the person had hit him with his car and pushed him out of the way to get out of the parking lot. *Id*. 32:16-33:9.

88.     The decision to arrest Plaintiff was made by Hussain and Lunt. *Id*. 46:23-47:11.

89.     The decision to arrest Plaintiff was made by Hussain and Lunt and was based on Russell's statement and the statement from the security guard. *Id*. 47:12-24.

90.     Hussain knew at the scene that Plaintiff was a former Suffolk County law enforcement official. *Id*. 60:8-11.

91.     At the time that Hussain approved of the car Alarm, he knew Plaintiff was a retired Lieutenant from the Suffolk County Police Department. *Id*. 60:20-24.

92.     Hussain approved of the car Alarm to see if there was any sort of damage or any paint transfer or dents to the car and to photograph the car itself. *Id*. 61:4-9.

93.     It is customary for the person who created a car Alarm to update the Alarm that the car was retrieved. *Id*. 72:14-17.

94.     Lunt authorized the cancellation of the car Alarm. *Id*. 72:17-73:3.

95.     It is the responsibility of the detective that requested the Alarm to update it promptly. *Id*. 73:7-10.

96.    Plaintiff was stopped a second time because the car Alarm was not updated promptly that the car was retrieved. *Id*. 73:18-74:2.

**Detective Ryan M. Lunt**

97.    Lunt served as a Detective in the Nassau County Police Department from 2017 to 2022, then in 2023 At the Third Precinct. Deposition Transcript of Det. Ryan Lunt, Exhibit G, 12:16-20.

98.    Lunt worked on a team with Vacchiano, Purcell, Panuthos and Hussain. Hussain was the Seargeant and team leader. *Id.* 13:15-22, 14:17-25.

99.    Lunt knew that Russell previously worked at the Third Precinct before being assigned to Internal Affairs when and heard his name in the past. *Id.* 16:4-17:14.

100.    On February 15, 2019, Lunt first learned of the parking lot incident between Plaintiff and Russell from IAB Inspector Stillman, who works out of Nassau Police Headquarters, not the Third Precinct. *Id.* 18:12-19:22.

101.    Inspector Stillman told Lunt that Russell was a victim and was on duty at the time of the incident when he was allegedly assaulted by Plaintiff. Stillman identified Plaintiff as the alleged perpetrator. *Id.* 25:20-28:16.

102.    Lunt did not include in his case notes that he received a call from Inspector Stillman. *Id.* 25:12-19.

103.    After receiving the call from Inspector Stillman, Lunt notified his team members, Hussain, Vacchiano, Purcell and Hussain, that Stillman called and Russell was assaulted by Plaintiff. *Id.* 28:21-29:14.

104.    Prior to traveling to the scene of the incident, Lunt looked up Plaintiff's DMV records based on information obtained from Inspector Stillman. *Id.* 28:21-29:7.

105.    Lunt learned that Plaintiff was a retired Suffolk County Police Lieutenant when he arrived at the scene. *Id.* 32:18-25.

106.    At the scene of the incident Russell told Lunt that Russell attempted to keep Plaintiff at the scene so he could be issued various traffic summons for excessive use of his horn, improper turn, improper license plate cover and leaving the scene of a motor vehicle accident. *Id*. 37:3-38:25.

107.    Lunt and Vacchiano met with witness Cameron Grady who witnessed the incident between Plaintiff and Russell. Grady signed a statement written by Lunt incorrectly stating that he witnessed Plaintiff intentionally bump Russell. *Id.* 43:21-52:5. *See also* Exhibit N, Grady's Letter to Judge Quinn.

108.    Lunt's case notes do not state that witness Cameron Grady said Plaintiff intentionally ran over and bumped Russell. Lunt Tr. 50:20-51:4.

109.    Lunt and Vacchiano met with bank manager Lorena Baez and viewed the inside security camera footage of the incident. *Id.* 53:25-54:21, 57:21-58:3.

110.    Lunt authored and signed under oath the Felony Complaint charging Plaintiff with Intentional Assault in the Second Degree, P.L. § 120.05, Leaving the Scene of an Accident with Personal Injury, V.T.L. § 600(2)(a),  Unsafe Turn/Failure to Signal, V.T.L. § 1163-a , Improper Cover of a License Plate, V.T.L. § 402(1)(b), and Use of a Horn that was Unnecessarily Loud or Harsh V.T.L. § 375(1)(a). *See* Exhibit M, Felony Complaint.

111.    Despite believing that Plaintiff was acting recklessly, Lunt charged Plaintiff with the intentional assault of Russell. Lunt Tr. 101:19-102:12.

112.    Lunt directed that a car Alarm be issued for the detention and seizure of Plaintiff's vehicle involved in the incident. *Id.* 79:15-80:2.

113.    Roche provided information for the Alarm. That information contained false information that Plaintiff was armed and dangerous, the vehicle was stolen and Plaintiff committed an assault. *Id.* 82:8-11, 86:4-8; *see also* Exhibit E, Alarm.

114.    After Plaintiff's vehicle was seized by the Nassau County Police Department and subsequently returned to him, the car Alarm requested by Lunt and entered by Roche was not removed or cancelled. Lunt Tr. 115:14-23; *see also* Exhibit E, Alarm.

115.    When Lunt arrested and held Plaintiff in police custody overnight to attend court the next day, Lunt did not request that Plaintiff be detained in a separate holding cell away from other arrestees because he was a former law enforcement officer, nor did Lunt state on any paperwork that Plaintiff was a former law enforcement officer to assure  his safety while in police custody. Lunt Tr. 126:3-127:5.

**John Caraccia**

116.    Caraccia, a Suffolk County Police Officer, was driving a marked Suffolk County police patrol car unit 102 with his partner Picconi on March 9, 2019. Deposition Transcript of John Caraccia, Exhibit P, 21:16-22:3.

117.    While driving in the Village of Deer Park, the patrol car's license plate reader, scanned Plaintiff's license plate indicating the vehicle was stolen and Plaintiff was armed and dangerous. *Id.* 26:18-27:17, 33:23-34:7.

118.    The officers turned on their police emergency lights, and Plaintiff immediately stopped his car in the middle of traffic. *Id.* 29:25-32:25.

119.    Plaintiff was immediately placed in custody without incident. *Id.* 37:13-17

120.    Plaintiff explained that his car was already surrendered, photographed and returned to him and there should not be any reason for the traffic stop. *Id.* 40:17-41:4

**Michael Guadalupe**

121.    On May 6, 2019 at approximately 1:50 p.m. witness Guadalupe was working as a New York State Trooper in his patrol car equipped with a license plate reader. Deposition Transcript of Michael Guadalupe, Exhibit Q, 45:22-46:22.

122.    At approximately 1:51 p.m. Guadalupe's patrol car plate reader scanned Plaintiff's license plate as Plaintiff drove by. *Id.* 47:7-24.

123.    Due to the car Alarm request requested by Lunt and entered by Det. Roche Guadalupe stopped Plaintiff's vehicle. *Id.* 59:15-60:11.

124.    Guadalupe conducted Plaintiff's car stop as if it was a possible felony as being a stolen vehicle. *Id.* 50:20-24.

125.    Plaintiff was detained for approximately 45 minutes. *Id.* 103:19-105:3.

**Lija Todoran**

126.    Todoran dated Plaintiff for almost 20 years. Deposition Transcript of Lija Todoran, Exhibit F, 23:17-20.

127.    In 2016, Todoran and Plaintiff moved to The Avalone Garden City Apartments. *Id.* 25:10-12.

128.    Plaintiff paid the rent for the Garden City apartment. *Id.* 26:11-13.

129.    Officers came to The Avalone Garden City, apartment of Plaintiff and Todoran, on February 15, 2019 around 10:00 p.m. when Plaintiff was not home. *Id.* 34:6-16.

130.    Todoran heard a lot of noise in front of their apartment and saw flashlights beaming into the bedroom window, and banging on the from door. Todoran heard "Mr. Hasper open up" and "Police, open up." *Id.* 34:25-35:10.

131.    Todoran did not know what was going on or why the officers were at the door. Three officers, one in uniform and two in suits who she assumed were detectives. They went right in the house without a warrant. *Id.* 35:12-19.

132.    They did not ask for permission to come in. They just barged in the house and walked around the house looking for Plaintiff. *Id.* 35:20-25, 36:2-4.

133.    Officers told Todoran they were looking to arrest Plaintiff. *Id.* 35:7-8.

134.    Todoran was not aware of what had occurred with Russell. *Id.* 36:21-23.

135.    The three officers said that they were not leaving until Plaintiff got home. *Id.* 37:19-38:3.

136.    They asked Todoran to call Plaintiff. *Id.* 38:7-9.

137.    Plaintiff then told Todoran that a lawyer is going to call the house to speak with the detectives. *Id.* 38:14-23.

138.    The lawyer spoke to one of the detectives and then they left. *Id.* 39:8-12.

Dated: Hauppauge, New York
      May 1, 2026                    Yours, etc.

*Anthony M. La Pinta*
**LA PINTA, LESKO & MISKIEWICZ, P.C.**
By: Anthony M. La Pinta, Esq.
Attorneys for Plaintiff
200 Vanderbilt Motor Parkway, Suite C-17
Hauppauge, New York 11788
(631) 231-1199

TO:   **GREENBERG TRAURIG, LLP**
Attorneys for Defendants
900 Stewart Avenue, 5th Floor
Garden City, New York 11530
(516) 629-9600